UNITED STATES
v.
HOLOPHANE CO., Inc.
Civ. No. 2659.

United States District Court,
S. D. Ohio, E. D.
Feb. 3, 1954.

Robert B. Hummel, Norman H. Seidler, Harry E. Pickering, U. S. Dept. of Justice, Antitrust Division, Cleveland, Ohio, for plaintiff.

Broad & Cassel, by Shepard Broad and Lewis Horwitz, Miami Beach, Fla., and Baker-Hostetler & Patterson, by Richard F. Stevens, Cleveland, Ohio, for defendant.

UNDERWOOD, Chief Judge.

This is an action by the United States of America to prevent and restrain the defendant, Holophane Company, Inc., from engaging in an allegedly unlawful combination and conspiracy and from being a party to contracts allegedly in restraint of interstate and foreign trade and commerce in violation of Section 1 of the Sherman Anti-Trust Act, 26 Stat. 209 (1890), 15 U.S.C.A. § 1.

The case was tried before the Court, and the Court having carefully considered the evidence, together with the pleadings and briefs, and being fully advised in the premises, makes the following findings of fact and conclusions of law.

### Findings of Fact.

1. The defendant is a corporation, organized and existing under the laws of the State of Delaware, and maintaining offices in New York, New York, and a factory in Newark, Ohio. It is engaged in the manufacture and sale of prismatic glassware and illuminating appliances containing prismatic glassware.

2. The defendant transacts business and maintains a factory and is found within the Eastern Division of the Southern District of Ohio.

3. Holophane Limited, hereinafter referred to as "Limited", a joint stock company organized and existing under the laws of the United Kingdom with offices and principal place of business in London, England, is named as a co-conspirator. It is engaged in the sale of prismatic glassware and the manufacture and sale of illuminating appliances containing prismatic glassware.

4. La Societe Anonyme Francaise Holophane, hereinafter referred to as "Francaise", a corporation organized and existing under the laws of France, with offices and principal place of business in Paris, France, is named as co-conspirator. It is engaged in the manufacture and sale of prismatic glassware and illuminating appliances containing prismatic glassware.

5. Prismatic glassware includes reflectors, refractors, lenses and lens plates, bearing configurations or prisms in the form of circles or lines or both, and is used to control the distribution and direction of artificial light. Prismatic glassware incorporated into illuminating appliances may be used to direct artificial light to a small area or

to diffuse artificial light over a wide area.

6. Illuminating appliances containing prismatic glassware are highly efficient and effective means of lighting factories, offices, schools, stores, hospitals, art galleries and radio broadcasting studios. Prismatic glassware is also used in transportation, marine, aviation, street and traffic lighting fixtures.

7. In 1948, the year prior to the filing of the complaint in this action, the total gross sales by the defendant of prismatic glassware and prismatic glassware fixtures were $3,517,365.75, of which, glassware sales amounted to $2,091,962.61 and fixture sales amounted to $1,425,402.14.

8. In 1921 "Limited" by patent license agreement granted to "Francaise" the right to make and the sole, full and exclusive license to sell prismatic glassware under the existing and future patents of "Limited" in Belgium, Spain, Portugal, Switzerland and Italy. The term of the agreement was five years from January 1, 1920, with option in "Francaise" to renew for a like term. "Francaise" exercised its option. In addition to royalty provisions, the license agreement provided that (a) articles manufactured under the license would be marked with the name "Holophane"; (b) "Francaise" would not use inventions, designs, or the trade name "Holophane" except in accordance with the license; (c) the parties would mutually exchange discoveries and improvements; (d) "Francaise" would prevent exportation from the licensed countries to other areas; (e) "Limited" would prevent the export into France or the licensed countries of Holophane goods.

This license, executed in 1921, was renewed with basically the same provisions in 1927, 1929, 1936 and 1940. The continuity of the license agreements was disrupted by the war, but a new license with similar terms was executed in 1947.

9. Otis A. Mygatt held the controlling stock interest in both "Limited" and "Francaise" in 1925. "Limited" held all of the stock of the Holophane Glass Co., Inc. Each company was separately managed. In addition, Charles Franck, now President of defendant, was Resident Manager of the American company from 1916 to 1925 and H. Hepworth Thompson, its General Manager. Mr. Thompson was also General Manager of "Limited". There is no evidence that Mygatt participated in the management of any of the companies.

10. In 1925, a group of executives, engineers and employees of the aforementioned Holophane Glass Company, Inc., organized the predecessor company of the defendant, for the purpose of purchasing the Holophane Glass Company, Inc., from "Limited". This group, which comprised the persons then actively engaged in the management of the Holophane Glass Company, Inc., was under the leadership of Charles Franck, then Resident Manager of the company and currently President of the defendant, and Joel B. Liberman, attorney for the company. On June 6, 1925, Joel B. Liberman obtained from "Limited" an option to purchase the stock of Holophane Glass Company, Inc., which he assigned to the aforementioned predecessor company of the defendant. The purchase price was $1,000,000. The net worth of Holophane Glass Company, Inc., was $1,197,312 for its land, buildings and equipment, the good will not having been evaluated.

11. After its purchase from "Limited", Holophane Glass Company, Inc., the New Jersey corporation, was merged into Holophane Illuminating Company, Inc., its purchaser, a New York Corporation. The name of the latter was immediately changed to Holophane Glass Company, Inc., i. e. the name of the original American company. In 1926 the New York corporation again changed its name to Holophane Company, Inc. In 1929 Holophane Company, Inc., the New York corporation, was merged into defendant, a Delaware corporation of the same name.

12. On September 15, 1925, the defendant's predecessor and "Limited" entered into a trading agreement which was characterized by Joel B. Liberman as a reciprocal trade and patent agreement of great value. It was signed on behalf of "Limited" by H. Hepworth Thompson as Managing Director, and for the defendant's predecessor by Charles Franck as Vice-President. It contained no termination date, and was in effect at the time of the trial.

The essential features of the agreement are as follows:

(a) The territory of the defendant's predecessor is defined as that part of the Continent of America north of the Panama Canal and adjacent islands (not including the West Indies), the Philippine Islands, the Republic of Cuba, and the Empire of Japan. The territory of "Limited" is defined as the whole of the world except the territory of the defendant's predecessor and the Republic of France and its Colonies.

(b) Each party agrees to use every means in its power to prevent the exportation from its territory into the territory of the other, of products sold or manufactured by it, except with the consent in writing of that party.

(c) Each party agrees that it will not carry on trade in the territory of the other, except at the request and for the benefit of that party.

(d) Each party agrees that it will neither apply for nor obtain patent or trade mark protection in the territory of the other, except at the request and for the benefit of that party.

(e) Each party agrees to communicate and assign every invention, design, discovery or improvement and trade mark to the other, and render any aid necessary to enable the other to secure proper protection in its territory.

(f) Each party agrees to supply to the other, when requested, Holophane products at a price equal to factory cost, plus 30%, delivered at place of manufacture.

(g) The agreement defines "Holophane products" as any product sold under the trade mark or trade name "Holophane" and/or manufactured or sold by either company.

13. On June 29, 1926, defendant's predecessor and "Francaise" entered into a patent and manufacturing agreement which had been prepared by Joel B. Liberman. The agreement was made effective as of September 15, 1925; contains no terminaton date; and in all of its essential terms is identical to the trading agreement between defendant's predecessor and "Limited". The agreement defines the territory of "Francaise" as the Republic of France and its Colonies. It was signed on behalf of the defendant's predecessor by Charles Franck as Vice-President and on behalf of "Francaise" by Andre Froget as L'Administrateur-Delegue.

14. When Joel B. Liberman, one of the founders of Holophane Illuminating Company, Inc., offered to sell said company the contract which he had negotiated in his own name with "Limited" to buy Holophane Glass Company, Inc., the New Jersey corporation, Mr. Liberman stated that he was able and did thereby offer similar advantages with "Francaise". The record, however, disclosed no specific obligation upon the defendant to enter into the agreement with "Francaise".

15. The restraints imposed by the agreements apply to many countries of the world in which none of the companies have ever carried on business.

Although the agreements cover the entire world, the defendant admits that in 1925 there were many countries in the world in which neither the defendant, "Limited" nor "Francaise" carried on business; other countries in which they made only occasional or isolated sales; and that even to date there are a number of countries in which none of the three companies had made any substantial effort to develop a market.

The agreements contain schedules listing those countries in which the par-

ties had patent and trade name and mark protection in 1925 and 1926. The schedules reveal that there were many countries within the territories of the defendant and "Limited" in which no patent or trade name or mark protection was listed.

16. The trading agreement between the defendant and "Limited" has been modified and elaborated upon in each of the following instances:

(a) In 1927 an understanding between the parties modified the trading agreement to the extent that "Limited" agreed to order 50% of its refractor requirements for South America from the defendant, and to pay a bonus to the defendant on the remaining 50%. It further provided for a free interchange of commercial and engineering information, including the right to visit and study the plants of each. After being renewed twice, this understanding was cancelled by "Limited" in 1933.

(b) In 1944 "Limited" sold to the defendant all of its rights to sell Holophane products in the South American territory; in exchange for $40,300 and an agreement for the mutual exchange of all research, technical, manufacturing and commercial information. The object of this transaction was to cement the relations between the two companies. On February 1, 1944, the parties entered into an agreement which extended the terms of the 1925 agreement to include South America in the territory of defendant. The parties also took this opportunity to reframe the definition of Holophane products to assure the application of the restraints to all products manufactured and sold by them, including products not subject to existing patents or trade marks, and products not marked "Holophane". Also in furtherance of their mutual interests, they agreed to a full and free exchange of all research, technical, manufacturing and commercial information.

The parties also agreed that in any future agreement with "Francaise", "Limited" would insert a provision preventing "Francaise" from exporting into South American Territory, although at the time France was occupied by Germany, and the parties were uncertain as to the future organization of "Francaise" after the war. In 1947, when "Limited" again granted a patent license to the re-established "Francaise", this obligation was fulfilled by a provision in that license that neither "Limited" nor "Francaise" would permit the exportation of their products into the territory of the defendant.

(c) On June 11, 1945, defendant and "Limited" entered into an inter-company buying agreement, which elaborated upon that provision in the 1925 trading agreement which required the parties to supply each other with Holophane products. The new arrangements permitted a party to ship to and invoice directly, a customer located in the territory of the other but only at the request and for the benefit of the party owning the territory. It further permitted the selling company to render engineering service directly to the customer to assure the securing of the order. Accordingly, new formulae were devised for determining the profit due the party into whose territory the shipment was made in order to compensate the selling company for the clerical and engineering service rendered.

It was also agreed that, with regard to any direct inquiries or purchase orders received by either company from the territory of the other, such orders or inquiries would be referred to that company for instructions.

17. The defendant and the co-conspirators, "Limited" and "Francaise", have adhered to and enforced the agreements set forth in Findings 12, 13 and 16 herein. The defendant has performed those acts and has adopted those policies which it was obligated to do pursuant to the specified provisions of the agreements as set forth in Findings 12, 13 and 16 herein.

18. In fulfillment of its obligations under the agreements with "Limited" and "Francaise", the defendant has im-

posed upon its customers and dealers contractual obligations not to export products purchased from it into the territory of "Limited" and "Francaise". The defendant rejects orders and requests for quotations from its customers whenever it suspects that the order is to be shipped into the territory of either "Francaise" or "Limited" and refers such customers either to "Francaise" or "Limited". This practice of the defendant has substantially affected the foreign commerce of its customers.

19. Although the defendant's answer alleges that the restrictive agreements were "reasonable and necessary for the protection of the business and good will sold", the defendant failed to establish this defense. Moreover, the defendant failed to establish that the agreements were subordinate to the alleged lawful purpose. The evidence establishes that the restrictive agreements were designed to eliminate competition between the parties and with outsiders in all markets of the world, and were neither measurable by, limited to, nor subordinate to the reasonable necessities of the sale.

20. The restrictive arrangements between the defendant and the co-conspirators, "Limited" and "Francaise", are in unreasonable restraint of the interstate and foreign commerce of the United States in prismatic glassware and appliances containing prismatic glassware.

21. The intended effects of the agreements between the defendant and the co-conspirators will continue unless prevented by this Court.

### Conclusions of Law.

1. The court has jurisdiction of the subject matter hereof and of the defendant, and the complaint states a cause of action against the defendant under the provisions of the Act of July 2, 1890, entitled "An act to protect trade and commerce against unlawful restraints and monopolies", as amended, commonly known as the Sherman Act, 15 U.S.C.A. § 1 et seq.

2. Beginning in or about 1925 and continuing at all times thereafter to the date of these findings, the defendant and the co-conspirators have been continuously engaged in a combination and conspiracy in restraint of trade and commerce in prismatic glassware and illuminating appliances containing prismatic glassware among the several states of the United Staes and with foreign nations and have been and are now parties to contracts, agreements and understandings in restraint of such trade and commerce; all in violation of Section 1 of the Sherman Act.

3. Plaintiff is entitled to a decree.