Alonso **MENENDEZ** et al., Owner-
Plaintiffs,

**The Republic of Cuba et al., Interventor-
Plaintiffs,**

v.

**FABER, COE & GREGG, INC., et al.,
Defendants.**

Nos. 61 Civ. 472, 61 Civ. 582, 61 Civ. 583,
61 Civ. 584, 61 Civ. 848, 61 Civ. 849, 61
Civ. 850, 61 Civ. 869 and 61 Civ. 3336.

United States District Court,
S. D. New York.

March 17, 1972.

Supplemental Memorandum
June 14, 1972.

Rabinowitz, Boudin & Standard, New York City (Victor Rabinowitz, Leonard B. Boudin, Kristin Booth Glen, David Rosenberg, New York City, of counsel), for interventor-plaintiffs.

Paul, Weiss, Goldberg, Rifkind, Wharton & Garrison, New York City (Allan Blumstein, David A. Rahm, New York City, of counsel), for defendant Faber, Coe & Gregg, Inc.

Strasser, Spiegelberg, Fried & Frank, New York City (Victor S. Friedman, Matthew Gluck, New York City, of counsel), for defendant Alfred Dunhill of London, Inc.

Solinger & Gordon, New York City (John C. Grosz, New York City, of counsel), for defendant Saks & Co.

## OPINION

FREDERICK van PELT BRYAN, District Judge:

These nine consolidated actions were tried without a jury.[1] They involve complicated controversies arising out of the take-over by the Castro Government of Cuba of the five leading manufacturers of Havana cigars whose factories, businesses and principal assets were situated in Cuba, and whose products were shipped to importers in this country.

Three of these five Cuban business entities, F. Palicio y Compania, S.A. (Palicio), Tabacalera Jose L. Piedra, S.A. (Tabacalera) and Por Larranga, S.A. (Larranga), are corporations organized and existing under Cuban law. The fourth, Cifuentes y Compania (Cifuentes), is a Cuban partnership. The fifth, Menendez, Garcia y Compania, Limitada (Menendez) is an entity unfamiliar to American law, designated as a "limited liability company" or a "limited partnership" under Cuban law. At the time of the take-over substantially all of the stockholders, officers and directors of the three corporations, the partners in the partnership and the owners of the limited liability company were Cuban citizens residing in that country. None were American citizens.

Brush & Bloch, New York City (Jac M. Wolff, New York City, Monroe P. Bloch, of counsel), Hubbell, Cohen & Stiefel, New York City (Myron Cohen, Maurice B. Stiefel, Irving Newman, New York City, of counsel), for owner-plaintiffs.

1. Jurisdiction is properly based on diversity of citizenship and the trademark laws of the United States.

For many years these entities manufactured, in Cuba, Havana cigars which were of the highest quality and reputation throughout the cigar-smoking world.[2] These cigars, sold under trademarks registered in the United States Patent Office, Cuba and other countries, were sold in large quantities to importers in the United States, principally the defendants, Faber, Coe & Gregg (Faber), Alfred Dunhill of London (Dunhill) and Saks & Company (Saks).

On September 15, 1960, the Castro Government of Cuba, acting under Cuban law, "intervened" these five entities—took possession of their businesses and assets and ousted the owners and those who had managed and controlled the enterprises on their behalf. The Cuban Government designated so-called "interventors" for each of the entities, who assumed complete possession and control of the businesses and assets and continued to operate them on behalf of the Government, to the exclusion of the officers, directors, shareholders, partners or other persons who otherwise would have continued to manage and conduct them.

The interventions, in practical effect, were complete confiscations. The owners were ousted without their consent from all properties and excluded from any participation in the businesses. Their rights to any receipts or profits were eliminated and no compensation was provided.

Subsequent to intervention, the interventors, acting on behalf of the Cuban Government, continued to manufacture cigars in the Cuban plants taken over and continued to export them under the same names and trademarks to the defendant-importers in the United States. The importers accepted the cigars shipped by the interventors but have not as yet paid for them and substantial sums remain due and owing for the purchase price of such cigars.

Following the interventions of September 15, 1960, most of those who had owned and controlled the five Cuban entities fled to the United States where they retained the New York law firm of Brush & Bloch to represent their interests. The nine actions now before me were commenced in this Court by Messrs. Brush & Bloch in the names and on behalf of the respective entities and their owners in the United States against the three defendant-importers. These plaintiffs sought (1) an injunction restraining the defendant-importers from infringing the plaintiffs' United States trademarks and from paying to anyone else the price of goods belonging to plaintiffs, originating from their plants, or bearing their United States trademarks; (2) an accounting, damages, and any sums found to be due to plaintiffs; and (3) the purchase price or value of cigars bearing plaintiff's trademarks and shipped from their plants in Cuba.[3]

Shortly after these nine actions were started, an action was brought in this Court in the names of these five Cuban entities by Rabinowitz & Boudin, a New York law firm, as attorneys for the interventors who had continued the operation of these businesses on behalf of the Cuban Government. Named as defendants were the members of the law firm of Brush & Bloch. Plaintiffs in that action sought (1) an injunction against Brush & Bloch restraining them from prosecuting the nine actions which they had commenced in this Court in the names of the entities; and (2) an order directing that the attorneys for the interventors, Rabinowitz & Boudin, be substituted as attorneys for the plaintiffs in the original nine actions.

The nine pending actions now before me were, for obvious reasons, held in abeyance pending final determination of the action brought by the interventors represented by Rabinowitz & Boudin against Brush & Bloch. The facts and the law in that case are fully discussed in

---

2. The brand names of these cigars are listed in footnote 15, *infra*.

3. Two other actions involving similar issues were commenced at the same time by Brush & Bloch but have not yet been tried.

my opinion, F. Palicio y Compania, S.A., et al. v. Brush et al., 256 F.Supp. 481 (S.D.N.Y.1966), affirmed on opinion below, 375 F.2d 1011 (2d Cir.), cert. denied, Brush v. Republic of Cuba, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967). It is unnecessary to repeat that discussion here. After extensive proceedings before me, final judgment in that action was entered holding that:

1. The interventors, through their attorneys Rabinowitz & Boudin, were entitled to pursue the claims for debts due from the American importers of Cuban cigars shipped to them by the interventors after intervention had taken place. The owners of the intervened entities were not entitled to pursue such claims.

2. The former owners, through their attorneys Brush & Bloch, were entitled to pursue claims for trademark infringement asserted in the pending actions and the interventors were not entitled to pursue such claims. However, the leave given to the owners to pursue the trademark infringement claims was not to be construed as a definitive holding that they were in fact the owners of the trademarks or were entitled to any rights thereunder. That issue remained to be litigated and determined in these actions together with questions of infringement.

Since the importers who are defendants in these nine pending actions were not parties to the action brought by the interventors against Brush & Bloch, and had not been heard, that decision was confined to rights as between the interventors, on the one hand, and the former owners of the entities, on the other. The defendant-importers were not precluded from raising and litigating in the nine pending actions any issues they might choose to raise between themselves and the sets of plaintiffs—the interventors and the owners of the entities.

Following the entry of final judgment in Palicio v. Brush & Bloch, appropriate steps were taken to adjust the posture of the nine actions now being decided, to conform to that decision. The nine actions were consolidated. The original plaintiffs (the owner-plaintiffs), represented by Brush & Bloch, were permitted to continue as parties plaintiff in the actions and to assert their claims for trademark infringement and unfair competition. The interventors and the Republic of Cuba (the interventor-plaintiffs) were permitted to intervene in the action as additional parties plaintiff and to assert claims for the purchase price of cigars shipped to the importer-defendants by the interventors after September 15, 1960, the date of intervention. These claims aggregated some $700,000, less various offsets claimed by the defendant-importers.

When Palicio v. Brush & Bloch was decided, it had been erroneously understood by all the parties to that action and by the Court that the amounts owed by the defendant-importers on the date of intervention for cigars shipped by the owner-plaintiffs prior to intervention were so small as to be of no significance. In an effort to avoid confusing further the already complex issues in that case, the interventors agreed to turn over to the owners this small sum and this issue was thus removed from that case. 256 F.Supp. 489, n. 8. For this reason, the question of who was entitled to pursue claims for the price of cigars shipped by the intervened entities before the intervention occurred was not passed upon in Palicio v. Brush & Bloch.

However, it subsequently developed that all parties in Palicio v. Brush & Bloch were under a complete misapprehension as to the facts on this subject. It now appears that the defendant-importers at the date of intervention had owed some $477,600 for shipments of cigars made prior to that date. The defendant-importers had paid out these amounts on the premise that such payments discharged their debts for such cigars. On the basis of these newly discovered facts, the parties in the actions now before the Court have asserted various claims, cross claims and counterclaims concerning the amounts due and owing for cigars shipped prior to inter-

vention and the payments of such amounts made by the defendant-importers. These claims present an additional set of issues for decision in the cases at Bar.

Thus, the issues now before the Court in these cases fall into three general categories:

1. Claims of the intervenor-plaintiffs against defendant-importers for the purchase price of cigars shipped by the interventors from Cuba subsequent to the intervention.

2. Claims arising out of shipments of cigars from Cuba to the defendant-importers by the intervened entities prior to the intervention on account of which the importers had made payments.

3. Claims of the owner-plaintiffs against the defendant-importers and the intervenor-plaintiffs for trademark infringement and unfair competition.

The various claims will be dealt with seriatim.[4]

## I. Post-Intervention Shipments

In view of my decision in Palicio v. Brush & Bloch, supra, that the interventors are entitled to pursue any claims for amounts due for cigars shipped subsequent to intervention and that the owners were not, such issues as there are as to such claims are solely between the interventors and the importers. There is little, if any, controversy as to these claims.

The importers concede that any amounts due and owing for post-intervention shipments are recoverable by the interventors subject to any offsets, cross claims or counterclaims to which the respective importers may be entitled. It has been stipulated that the unpaid purchase price for post-intervention shipments received by the respective importers is in the following amounts: Faber, $582,588.86; Dunhill, $92,949.70; Saks, $24,250.00.

Defendant Faber asserts offsets against the amounts due and owing by it for post-intervention shipments of $144,799.80 for defective cigars received and for promotional and other expenses incurred, both before and after intervention. Dunhill asserts offsets against the amount due and owing by it of $9,595.72 for similar items arising both before and after intervention. The validity and amount of these offsets are conceded both by the interventors and the owners, who have stipulated that, as between themselves, each is chargeable with such proportion of the offsets as their respective total recoveries in these actions bear to one another.

In addition, Faber claims an offset of approximately $20,000 against the interventors representing the value of assets in Cuba of a wholly-owned subsidiary concededly expropriated by the Cuban Government on September 15, 1960. However, since the principles governing resolution of this issue are still in process of litigation, Banco Nacional de Cuba v. First National City Bank, 270 F.Supp. 1004 (S.D.N.Y.1967), reversed, 431 F.2d 394 (2d Cir. 1970), cert. granted and case remanded for reconsideration, 400 U.S. 1019, 91 S.Ct. 581, 27 L.Ed.2d 630 (1971), reversed (adhering to original opinion), 442 F.2d 530 (2d Cir. 1971), motion for waiver of clerk's costs denied, 402 U.S. 940, 91 S.Ct. 1611, 291 L.Ed.2d 108 (1971), cert. granted, 404 U.S. 820, 92 S.Ct. 79, 30 L.Ed.2d 48 (1971), Faber and the interventors have stipulated that decision may be reserved on this claim of offset pending final determination of that case.

I find, therefore, that the interventors are entitled to recover from the respective importers the amounts due for post-intervention shipments to them, less the proportion of the conceded offsets allowable to each defendant by stipulation of the parties and, with respect to

---

4. Hereafter, the owner-plaintiffs will be referred to as the owners, the interventor-plaintiffs as the interventors, and the defendant-importers as the importers.

the claims against Faber, subject to resolution of Faber's claim of offset for the value of assets expropriated in Cuba. I so hold.

## II. *Pre-Intervention Shipments*

It is undisputed that as of September 15, 1960, when intervention took place, there were substantial amounts due and owing from the respective importers for cigars shipped prior to that date by the Cuban entities which were intervened, in the following approximate amounts: Faber, $322,000; Dunhill, $148,600; Saks, $6,600. It is also undisputed that within three months following intervention the importers paid out these sums upon the premise that they were discharging their obligations to pay for such shipments. The importers claim that they made such payments to the interventors but the interventors do not admit this to be so, except to a limited extent.

As previously indicated (*supra*, pp. 533–534), at the time Palicio v. Brush & Bloch was decided, the parties to that action, for reasons that are not entirely clear, were apparently unaware either of the large amounts so due from the importers or that the importers had paid out these amounts subsequent to intervention. Thus, no questions with respect to amounts due for pre-intervention shipments were raised or passed upon in that case.

Subsequent to the final determination of Palicio v. Brush & Bloch, the owners became aware of the facts concerning the amounts due and owing and the payments made on account of pre-intervention shipments. They thereupon asserted in the actions now before me claims (1) to recover from the importers the amounts due and owing for cigars shipped prior to intervention upon the premise that the importers had the obligation to pay the owners for such shipments and that the payments to the interventors did not discharge the importers' obligations to pay the owners therefor, or (2) to recover from the interventors the amounts paid to them by the

importers for cigars shipped prior to intervention on the premise that these amounts were in fact due and owing to them and had been improperly paid to and retained by the interventors.

The importers deny any liability to the owners for pre-intervention shipments. They claim that the payments by them to the interventors were properly made and fully discharged their obligations to pay for such shipments. If, however, the payments to the interventors did not discharge the importers' obligations to the owners, and they now are required to pay the owners for pre-intervention shipments, the importers claim they are entitled to recover from the interventors the amounts paid to them by mistake.

The interventors, in turn, maintain (1) that there is no proof that they received the payments for most of these shipments; (2) that if they did receive such payments, they had the right to be paid for such shipments and are entitled to retain the amounts so received, or (3) that, in any event, the sums so paid are not recoverable from them by either the importers or the owners.

### A.

There is no doubt that the importers paid out the equivalent of the amount due and owing for pre-intervention shipments within some three months subsequent to intervention. However, before the legal effect of such payments can be determined, the question of who was entitled to receive such payments must be resolved, for if the interventors were entitled to be paid for such shipments, then payment was properly made to them and discharged the importers' obligations.

Prior to intervention, the importers had paid for shipments of cigars from the Cuban factories of the owners in three ways:

(1) Payment by check sent directly to the factories in Cuba;

(2) Payment to a New York bank, acting as collecting bank for a Cuban

bank—the New York bank presenting a trade *acceptance to the importer,* who paid by check to the order of the New York bank when the trade acceptance became due; and

(3) Payment to a New York collecting bank as in (2) above, except that the importer's check was made payable to the order of the Cuban entity who had made the shipment and/or the collecting bank.[5]

After the interventions on September 15, 1960, the importers continued to make payments on account of the pre-intervention shipments in the same way and through the same channels as they had theretofore. The importers produced almost all of their cancelled checks on these transactions. These checks were payable to one of the Cuban entities or to a New York collecting bank, or to the entity and/or the New York collecting bank, depending on the method of payment used.

Where the importers' cancelled checks bear legible or identifiable endorsements or the records of the collecting bank indicate that the funds were transferred to Banco Nacional de Cuba, the interventors acknowledge that they received the payments. These payments amount to some $93,400. As to most of the cancelled checks however, aggregating some $384,000, the endorsements are illegible and the bank records reflecting the ultimate recipient of the payments are unavailable. The interventors do not admit that they received the $384,000 represented by these checks. They do not go so far, however, as to deny that they were the ultimate recipients of these amounts; their position is simply that they do not know whether they received them or not.[6]

There is no doubt that the New York banks, *acting in these transactions as* agents for collection of Cuban banks, paid out the funds paid to them by the importers in accordance with their usual business practices previously followed and in the regular course of business.[7]

It is equally plain that none of the monies in question were ever received by the owners or anyone on their behalf. Responsible executives of each of the owners, familiar with the facts, so testified. Their testimony is entirely credible and there is not a scintilla of evidence to contradict it.

■ The interventors seized all the records of the owners' businesses in Cuba when they took over the Cuban offices and factories on September 15, 1960. The payments by the importers were made in accordance with long established practices and were destined for the Cuban factories. The interventors admittedly received a substantial portion of the funds and they are unable to deny or to submit any records to indicate that they did not receive the balance of such payments. Under all the circumstances here and on the evidence in this record, the only conclusion which can be reached is that the interventors received all of the payments for pre-intervention shipments made by the importers subsequent to intervention, and I so hold.

**B.**

■ The interventors contend that they had the right to be paid the amounts due and owing by the importers for pre-intervention shipments and that the payments by the importers to them for such shipments were properly made. If that contention were correct, then the importers' obligations to pay for cigars

---

5. In some instances, the New York collecting bank transmitted the funds to an intermediate Canadian collecting bank for transmission to the ultimate recipient in Cuba.

6. Counsel for the interventors, after several trips to Cuba, represented that he was unable to secure any records re-

lating to these transactions and stated that such records as there may have been in Cuba have been destroyed.

7. There is no evidence whatever to support the interventors' suggestion that the New York collecting banks may have retained any of these payments.

shipped prior to intervention would have been discharged by payment to the interventors and the owners could not recover from the importers for such shipments. However, it was not the interventors but the owners who were entitled to be paid for such shipments.

The five Cuban entities taken over by the Cuban Government on September 15, 1960 were all organized under Cuban law and doing business in Cuba. Their plants and physical properties were on Cuban soil. Substantially all of the shareholders and other owners and the officers and directors were Cuban citizens and nationals residing in Cuba. The properties of the entities in Cuba were seized by the interventors under decree of the Cuban Government.

■ Thus, these were confiscations by a foreign state of the property of its own nationals within the state and cannot be said to have been in violation of international law, "no matter how flagrant and regardless of whether compensation has been provided." Palicio v. Brush & Bloch, 256 F.Supp. at 487, and authorities there cited. Under Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), the act of state doctrine proscribes this Court from questioning the validity of the Cuban decrees and the confiscation of property of Cuban nationals in Cuba by the Cuban Government thereunder. Nor are such confiscations within the purview of the Hickenlooper Amendment to the Foreign Assistance Act of 1964, 22 U.S.C. § 2370(e) (2), "But rather within the specific exception excluding application of the amendment 'in any case in which an act of a foreign state is not contrary to international law'." Palicio v. Brush & Bloch, supra, 256 F. Supp. at 487.

It is for these reasons that I have held that the interventors are entitled to recover from the importers the amounts due and owing for cigars shipped to the importers by the interventors subsequent to intervention. (Part I, supra.) For the cigars so shipped were either on hand or were manufactured from tobac-

co which was on hand in the Cuban factories when they were seized. Thus, they consisted of physical property in Cuba in the possession of the Cuban Government through expropriation. The debts of the importers for such cigars were obligations to pay for tangible physical property then already in the possession of the interventors and shipped from Cuba by them. These debts were not in existence at the time of the seizure.

The debts of the importers for pre-intervention shipments are in quite a different posture. These debts are for the price of cigars owned by and in the possession of the owner-plaintiffs prior to intervention and shipped by them to the importers in the United States before intervention took place. Plainly, however, they were debts due to Cuban nationals at the date of intervention.

The question, then, is how these debts were affected by the confiscations and what effect, if any, the confiscations had on the power of this Court to enforce them. This depends, in turn, on where the debts are found to have been located.

If the debts were property of the owners, located in Cuba at the time of intervention, it may be that they were taken over by the Cuban Government when intervention occurred, in which case this Court would be powerless to question such confiscations for the reasons which have been discussed. If, on the other hand, the debts constitute property within the United States at the time of confiscation, quite different principles apply.

"When property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state 'only if they are consistent with the policy and law of the United States,'" Republic of Iraq v. First Nat'l City Bank, 353 F.2d 47, 51 (2d Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966). As Palicio v. Brush & Bloch makes clear, "[a]cts of intervention and nationalization which do not afford compensation to the persons adversely af-

fected are undoubtedly inconsistent with our policy and laws," and, quite plainly, the Cuban decrees of intervention deprived the owners of their property contrary to our policy against confiscation without compensation, 256 F.Supp. at 488.

■ Here, the debts due and owing from the importers to the owners for pre-intervention shipments were not property of the owners located in Cuba at the time of intervention. Such debts were located in the United States and constituted property of the owners in this country. As to such property, the Cuban decrees of confiscation will not be given effect in our Courts.

■ It is well established that the situs of a debt is located with the debtor. See Harris v. Balk, 198 U.S. 215, 25 S. Ct. 625, 49 L.Ed. 1023 (1905); Blackstone v. Miller, 188 U.S. 189, 23 S.Ct. 277, 47 L.Ed. 439 (1903); Curry v. McCanless, 307 U.S. 357, 59 S.Ct. 900, 83 L.Ed. 1339 (1939). Republic of Iraq v. First Nat'l City Bank, *supra*, so held as to a bank account in New York of the late King Faisal II of Iraq, which the Republican Government of Iraq had attempted to confiscate. King Faisal was a citizen of Iraq who had resided in and was present in the country at the time of his death. The Court held that the bank account constituted property in the United States, stating:

"In this case . . . the bank account . . . [cannot] realistically be considered as being within Iraq simply because King Faisal resided and was physically present there at the time of his death. . . . So far as appears on this record, only a court in the United States could compel the bank to pay the balance in the account. . . . The property here at issue thus was within the United States." 353 F.2d at 51.

The court went on to hold that since this account was located here, it would not give effect to the Iraqi decree of confiscation, despite the act of state doctrine, since the decree was incon-

sistent with the policy and laws of this country.

*Republic of Iraq* is dispositive of the instant issue. The same principles preclude this Court's giving effect to the Cuban decrees of confiscation with respect to the debts for pre-intervention cigars situated in the United States.

The interventors' reliance on Texas v. New Jersey, 379 U.S. 674, 85 S.Ct. 626, 13 L.Ed.2d 596 (1965) is misplaced. In that case several of our states sought to escheat debts owed by the Sun Oil Company to 1,730 small creditors who had never appeared to collect them. Sun Oil was incorporated in New Jersey and had its principal place of business in Pennsylvania. The amounts owed were evidenced on the books of Sun's two Texas offices or were owing to persons whose last known address was in Texas. The Court held that "fairness among the States requires that the right and power to escheat the debt should be accorded to the State of the creditor's last known address as shown by the debtor's books and records." 379 U.S. at 680–681, 85 S.Ct. at 630. It is clear, however, that the Court did not lay down a general rule as to the situs of debts and that the opinion rested on special considerations primarily applicable to escheat. In conclusion, the Court stated:

We realize that this case could have been resolved otherwise, for the issue here is not controlled by statutory or constitutional provisions or by past decisions, nor is it entirely one of logic. It is fundamentally a question of ease of administration and of equity. We believe that the rule we adopt is the fairest, is easy to apply, and in the long run will be the most generally acceptable to all the States.

379 U.S. at 683, 85 S.Ct. at 631. Moreover, even were Texas v. New Jersey capable of the sweeping construction contended for by the interventors, such a construction is foreclosed by the later decision of the Court of Appeals of this circuit in *Republic of Iraq, supra.*

Thus, the interventors' contention that they were entitled to be paid such debts

by the importers and thus that the owners are precluded from recovering debts due from the importers for pre-intervention shipments must fail.

The interventors make a further rather involved contention based on the Cuban currency control regulations promulgated soon after the Castro Government came to power. This contention, a variation of the interventors' claims that they had the right to be paid for pre-intervention shipments, should be considered at this point, although it also bears on derivative claims of the importers against the interventors which are discussed *infra*.

What the interventors seek to accomplish by this contention in practical effect is to retain the payments made to them by the importers for pre-intervention shipments, even if they were not entitled to receive such payments. This they do by claiming that the Cuban currency control regulations bar the owners from obtaining judgment against the importers for the pre-intervention debts. If the owners cannot obtain judgment compelling the importers to pay them for these debts, the importers, then, would not have suffered any loss by reason of their payments to the interventors and would have no right to recovery against the interventors for such payments. The interventors would then be able to retain the payments so made to them, even if they were not entitled to be paid for such shipments.

Throughout most of 1960, prior to intervention, under these currency regulations, dollars which came from the United States to Cuba in payment for Cuban cigars sold to importers in the United States, passed through the hands of Banco Nacional de Cuba. The Bank retained the dollars on behalf of the Cuban Government and set up an equivalent credit in pesos to the account of the Cuban entity which had made the sale. Thus, say the interventors, had intervention not occurred and had the owners continued to carry on their businesses in Cuba, the owners would have been able to receive only Cuban pesos for

the cigars sold in the United States and would not have received the United States dollars paid by the importers. These would have been withheld for the account of the Cuban Government. From this, the interventors conclude that the owners are not entitled to recover from the importers the dollars which the importers owed for such cigars. At most, they say, the owners are entitled to recover the dollar value, as of the date of *judgment*, of the Cuban pesos which would have come into the hands of the owners had intervention not occurred and had they continued their businesses in Cuba. The interventors rather neatly conclude from this that since there is presently no rate of exchange between Cuban pesos and United States dollars and it has not been shown that the Cuban peso has any present value in terms of United States dollars, the owners can recover nothing from the importers and, in consequence, the importers can receive nothing from the interventors on their claims. *See infra.*

The validity of the Cuban currency control regulations in Cuba is not in question here. Currency control regulations of various types have long been employed by this and many other nations and such regulations have been applied in appropriate cases by the courts of many countries. *E. g.*, In Re Helbert Wagg & Co., Ltd. [1956] 1 All E.R. 129; Zivnostenka Banka National Corp. v. Frankman [1949] 2 All E.R. 671; Kahler v. Midland Bank, Ltd. [1949] 2 All E.R. 621. This is scarcely open to challenge. But it is quite plain that the Cuban regulations have no application in the cases at bar.

The interventors' argument, based on the Cuban currency regulations, ingenious though it may be, conveniently bypasses the operative facts in these cases and the legal conclusions which such facts compel.

These cases are not like Tillman v. Russo Asiatic Bank, 51 F.2d 1023 (2d Cir. 1931) and Pan-American Life Insurance Co. v. Blanco, 362 F.2d 167 (5th Cir. 1966), cited by the interventors,

where debts were due in a foreign country payable in the currency of that country and thus plaintiffs could recover only what that currency was worth in this country on the date of judgment. See Deutsche Bank Filiale Nurnberg v. Humphrey, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926).

Nor are these cases like In Re Helbert Wagg & Co. Ltd., *supra*. Without going into the complications of the *Wagg* case in detail, it may be noted that the debt there arose out of a loan secured by a mortgage on coal fields in Germany; the debt was situated in Germany where the debtor, a German company, resided and the loan agreement provided and the parties intended that their rights should be governed by German law. It was held that the debt had been extinguished by payment by the debtor of Reichmarks to the appropriate German governmental agency which were credited to the account of the creditor as German foreign exchange control legislation required.

■ In the cases at bar, on the other hand, the debtors were corporations located in the United States; the debts were due for merchandise received here; were situated in the United States; and were enforceable here and suit was properly brought in the United States courts by parties present in the United States. The debts were payable in dollars, not in Cuban currency. The Cuban currency regulations, valid though they may be in Cuba, cannot be given extraterritorial effect to bar any rights which the owners may have to recover from the importers in our courts any dollar amounts due them for pre-intervention shipments.

Moreover, the practical effect of the interventors' theory would be to enable them to retain the payments made to them by the importers for pre-intervention shipments, even if not legally entitled to such payments under United States law. Thus, the interventors would have succeeded by indirection in confiscating these debts, even though this would be contrary to the laws and policy of this country. This would be an unconscionable result and will not be permitted.

■ Finally, the interventors' contention that since they assumed the owners' accounts payable when they took over the Cuban factories, they are entitled to succeed to the owners' accounts receivable, is quite beside the point. Mere assumption of the accounts payable, for whatever reason, cannot give validity in the United States courts to Cuban decrees of expropriation purporting to affect property, such as the debts due from the importers for pre-intervention shipments located within the United States.

■ I hold that the interventors did not have the right to be paid for pre-intervention shipments and that the owners are entitled to pursue claims for such amounts as may be due and owing from the importers therefor.

### C.

The owners assert that the importers remain liable to them for the amounts which were due and owing on the date of intervention for pre-intervention shipments and that they are entitled to recover such amounts from the importers.

The importers deny such liability. They contend that the payments of the full amounts due for pre-intervention shipments which they made to the interventors constituted payment of these debts and fully discharged their obligations to the owners therefor. The importers' contention rests on three alternate grounds:

(1) That the banks to which payments were made were agents of the owners and thus payment to the banks was sufficient to discharge the obligations of the importers to the owners. E. g., Johnson v. Donnell, 90 N.Y. 1 (1882); 43 N.Y. Jur., Payment, § 27;

(2) That even if these banks were no longer in fact the owners' agents following intervention, they nevertheless had apparent authority to accept payment and payment to one with apparent authority discharges the debtor. E. g., Wangner

v. Grimm, 169 N.Y. 421, 62 N.E. 569 (1901); 43 N.Y.Jur., Payment, § 27; and

 (3) That the owners' failure to advise the importers to cease making further payments to the collecting banks or the Cuban factories, as had theretofore been customary, estops the owners from now asserting their claims against the importers.

It is plain from the evidence in this record that none of these grounds has merit. The evidence establishes that following intervention, (1) the banks to which payments were made were no longer acting as agents for the owners; (2) the importers knew the banks were not acting as agents for the owners; (3) the failure of the owners to advise the importers to cease making further payments in accordance with previous practice does not estop the owners from pursuing these claims.

 Perhaps the best indication that the banks were not acting as agents for the owners is that no effort was made to transmit the funds paid by the importers to the owners. Instead, these funds were transmitted by the banks to the interventors. It is inconceivable that the banks were unaware of the intervention or that they thought they were still dealing with and on behalf of the owners. Most of these payments were made by the importers a considerable period after the September 15th interventions, principally in October, November and December, 1960. By this time, Cuban expropriations, including those of cigar factories, had been well publicized in the United States and must have come to the attention of the collecting banks. Indeed, many banks had branches in Cuba which were taken over by the Cuban Government under decrees of intervention at about the same time. On the basis of this record, it is quite plain that the banks were acting, and knew they were acting, on behalf of the interventors. When the payments by the importers to the collecting banks for pre-intervention shipments were made, the banks were agents of the interventors and not the owners.

The importers urge that, for an extended period, they had dealt with the banks as agents for the owners and that the banks therefore had apparent authority to accept payment on behalf of the owners in the absence of any word to the contrary. Moreover, claim the importers, responsible executives of each of the owners visited executive officers of the importers very shortly after the interventions and gave no indication that the importers were to cease making payments to the banks in accordance with their previous practice. In view of this and the stipulated fact that the first written communication from the owners demanding payment for the pre-intervention shipments was a letter from their counsel in early 1961, the importers say that the owners are estopped from now claiming that they are entitled to be paid for pre-intervention shipments. In effect, the importers maintain that their payments to the banks, as apparent agents of the owners, discharged their obligations for pre-intervention shipments and that the owners are estopped from denying this.

 It is plain, however, that the doctrine of apparent authority or estoppel may be invoked by a third person dealing with an agent (here the importers) "only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized. Further, the third person must believe the agent to be authorized." Restatement, Second, Agency § 8, Comment and cases there cited.

The two cases relied upon by the importers, Louis Solomon, Inc. v. Deutsch, 123 Misc. 247, 205 N.Y.S. 33 (App. Term 1st Dep't 1924) and Herzfeld v. National City Bank of New York, 175 Misc. 534, 24 N.Y.S.2d 69 (Mun.Ct.N.Y.Co.1940), are not to the contrary. *Solomon* merely restates the general rule that an agent without actual authority may have apparent authority to receive payment. There, however, it was specifically noted

that the defendant making payment had no knowledge that the agent lacked authority. *Herzfeld* has nothing to do with the sufficiency of payment to an agent. There, a purchaser of carpets in New York, in accordance with the terms of the contract tendered the purchase price in Belgian francs to a New York bank acting on behalf of the seller in Belgium. A United States currency regulation prevented the Belgian citizen from receiving the funds in Belgium. When the bank refused to accept the tender, the purchaser brought an action of replevin to recover the documents of title. It was held that the contract and the notification by the bank called for payment in francs and that plaintiff's tender was therefore sufficient. *Herzfeld* does not stand for the proposition that payment to a former agent known no longer to possess authority to act on the principal's behalf is sufficient to discharge the obligation to the principal.

In the cases at bar, the evidence establishes that the importers knew that the banks were not transmitting the money paid by them to the owners and thus were not acting as agents of the owners. It has been stipulated that the importers, shortly after intervention, became aware that the factory representatives through whom they were ordering cigars represented the interventors rather than the owners.[8] Thus, it can only be concluded that the importers knew of the intervention shortly after it occurred. Moreover, apart from this, there is ample evidence in the record to support the conclusion that the importers were well aware of the fact of intervention. Indeed, it appears that, on visiting the importers in New York, executives of the owners explained the consequences and

effect of the interventions on their factories and businesses in Cuba. In these circumstances, it would strain credulity to suppose that the importers believed, or reasonably could have believed, that the payments which they made to the collecting banks in October, November and December, 1960 were ultimately being received by anyone other than the interventors.[9]

■ I find the importers well knew that, following intervention, the collecting banks were acting as agents for the interventors and not the owners, and also knew that the payments they were making to the collecting banks were ultimately received by the interventors in Cuba. Obviously, the importers also knew that the payments they made directly to the Cuban factories were received by the interventors in Cuba. The importers have failed to show either that the collecting banks had apparent authority to act on behalf of the owners or that the owners are estopped from denying such authority.

■ I hold that the payments made on account of pre-intervention shipments by the importers did not discharge the importers' obligations to make payment to the owners for such shipments. The importers remain liable to the owner-plaintiffs for the price of pre-intervention shipments of cigars and they are entitled to recover the amounts so due and owing from the importers.

### D.

The finding that the importers are liable to the owners for pre-intervention shipments obviously makes it unnecessary to consider the alternative claims asserted by the owners against the in-

---

8. As to defendant Saks, the stipulation simply states that it learned of the decrees of intervention shortly after September 15, 1960.

9. The importers suggest that they continued to make payments as they had in the past because they were confused as to the respective legal rights of the owners and the interventors. Thus, the importers, in their post-trial briefs, say:

"Standing in the middle were the importers. After September 15, 1960, they knew, of course, that they were dealing with new people, but new people selling the same product in the same fashion as before." In view of the lack of guiding precedent, the importers' uncertainty may be understandable; this, however, cannot alter the fact that they knew that the interventors and not the owners were receiving their payments.

terventors for monies received by the interventors for such shipments. However, that holding makes it necessary to decide the importers' claims against the interventors for the monies heretofore paid by them to the interventors on account of these shipments.

The importers contend that they made such payments in good faith in the belief that they were discharging their obligations to pay for the pre-intervention shipments. Since they were mistaken in that belief and are now required to pay the owners for these same shipments, the importers urge that they are entitled to reimbursement from the interventors by setting off these amounts against the amounts found to be due to the interventors for post-intervention shipments.

The interventors deny that these payments may be recovered from them by way of offset or otherwise. They first urge that since the payments were made voluntarily by the importers as a result of mistake of law, they are therefore not recoverable.[10]

It appears once to have been the general rule that money voluntarily paid, even though because of mistake, could be recovered only if the mistake was one of fact and not if it was one of law. The rule, however, was much criticized, e. g., 5 Williston, Contracts, § 1581; 4 Fordham L.Rev. 466 (1935), and, in 1942, New York abolished the arbitrary distinction between mistakes of fact and law and removed any technical bar to recovery upon a mistake of law theory. The present New York statute, N.Y.C. P.L.R. § 3005, provides:

> When relief against a mistake is sought in an action or by way of defense or counterclaim, relief shall not be denied merely because the mistake is one of law rather than one of fact.

In accordance with the statute, relief on grounds of mistake of law may now be granted in New York. *E. g.,* Robida v. Mirrington, 1 Misc.2d 968, 149 N.Y. S.2d 152 (Sup.Ct.1956); Chase National Bank of City of New York v. Battat, 105 N.Y.S.2d 13 (Sup.Ct.1951); 157 Prince Street Corp. v. Michelini, 62 N.Y. S.2d 148 (Sup.Ct.1946), aff'd 271 App. Div. 777, 66 N.Y.S.2d 406 (App.Div. 1st Dep't 1946).

Mercury Machine Importing Corp. v. City of New York, 3 N.Y.2d 418, 165 N.Y.S.2d 517, 144 N.E.2d 400 (1957), relied on by the interventors, is clearly distinguishable. There, suit was brought for recovery of taxes paid under a statute later held unconstitutional. With two judges dissenting, it was held that in such circumstances *taxes* paid under "mistake of law" could not be recovered. Plainly, *Mercury Machine* was based on special policy considerations applicable to the area of taxation and public finance:

> When the exigencies of public finance are considered, differing in some respects from private transactions, against the background of the traditional rule that taxes cannot be recovered for mistake of law in the absence of duress or of protest, we have concluded to follow the decisions in the States of Connecticut and Kentucky which early recognized mistakes of law as affording ground for relief in certain cases between private parties, but, nevertheless, like other States, denied it in the case of tax refunds, in the absence of duress, where protest has not been lodged.

3 N.Y.2d at 429, 165 N.Y.S.2d at 523, 144 N.E.2d at 405.

In the case at bar, the only policy to be served by allowing the interventors to retain the funds paid under mistake

---

10. Citing Flower v. State, 65 Misc. 145, 121 N.Y.S. 96, aff'd 143 App.Div. 871, 128 N.Y.S. 208 (3rd Dep't 1911); Boss v. Hutchinson, 182 App.Div. 88, 169 N.Y.S. 513 (1st Dep't 1918); County Securities, Inc. v. Warwick Properties, Inc., 176 Misc. 272, 24 N.Y.S.2d 971 (Sup.Ct. Westchester Co. 1940), aff'd 263 App.Div. 964, 33 N.Y.S.2d 825, leave to appeal denied, 263 App.Div. 1008, 34 N.Y.S.2d 520 (App.Div.2d Dep't 1942), modified, 289 N.Y. 774, 46 N.E.2d 844 (1943); 5 Williston, Contracts § 1581 et seq.

of law is that against the disturbance of settled transactions. Quite plainly, however, New York has determined that that policy is not determinative and may be outweighed by other factors. Moreover, it is difficult to see how that policy is furthered where, as here, recovery is sought only by way of set-off, rather than in an independent action for affirmative relief.

 Here, the payments by the importers to the interventors were voluntarily made in good faith because of understandable mistake. The interventors had no right to receive or retain such payments. Whether the mistake of the importers was one of fact or law or both makes no difference. The importers are entitled to recover the amounts so paid by way of set-off against the amounts found to be due to the interventors from the importers for post-intervention shipments, unless such recovery is barred for some other reason.

The interventors contend that even if the importers have established claims for relief against them on the ground of mistake, the importers cannot enforce such claims because of the act of state doctrine and the Cuban Currency Control Regulations. The contention with respect to the Currency Control Regulations has already been disposed of, Section B, *supra,* and needs no further discussion here.

The interventors' contention that the act of state doctrine bars recovery by the importers rests upon a different footing from their contention that under the doctrine they are entitled to payment for pre-intervention shipments.

The interventors' position here is that even if, as I have held, the owners are entitled to recover the pre-intervention debts from the importers, nevertheless the act of state doctrine precludes the importers from recovering the payments made to the interventors by mistake. This, of course, would result in the importers paying twice for the pre-intervention shipments and, in practical effect, would permit the interventors by indirection to realize on the debts though, as I have held, this could not be accomplished by the confiscatory decrees of intervention.

The interventors' argument runs this way: The importers' claims against them are characterized as claims for breaches of implied contracts to repay to the importers the amounts paid by mistake. These breaches of contract are said to have occurred in Cuba where the interventors resided and where the funds representing the payments were eventually received. Since the obligations of the interventors to make repayment were obligations for such breaches of contract they had a situs in Cuba. The refusal of the interventors to honor these obligations was an act of the Cuban state repudiating obligations situated in that country. Thus, under the principles laid down in Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964), this Court may not question that repudiation. Relying on French v. Banco Nacional de Cuba, 23 N.Y.2d 46, 295 N.Y. S.2d 433, 242 N.E.2d 704 (1968),[11] it is said, further, that the Hickenlooper Amendment[12] is not applicable here be-

11. In French, the plaintiff's assignor had invested a large sum in Cuban farm land. He was granted eight tax exemption certificates by the pre-Castro Cuban Government, entitling him to export without tax $150,000 as the proceeds from his Cuban investment. The certificates recited that upon presentation of a specified number of pesos to Banco Nacional, plaintiff's assignor was to receive a check for an equal amount in United States dollars, exempt from the tax on the exportation of money. In 1959 a Cuban Govern-

mental regulation suspended the processing of tax exemption certificates and late in that year plaintiff's assignor was refused dollars for the pesos which he presented. Plaintiff brought suit in New York to recover the dollar amount of the certificates. The New York Court of Appeals, three judges dissenting, held the repudiation to be an act of state to which the Hickenlooper amendment was inapplicable and denied recovery.

12. . . . [N]o court in the United States shall decline on the ground of

cause these are not cases "in which a claim of title or other right to *property*" is being asserted, but only claims for breaches of contract repudiated by acts of the Cuban State, which is governed by Sabbatino.

As I view these contentions, it is unnecessary to reach the somewhat troublesome question as to applicability of the Hickenlooper Amendment. For the interventors' act of state argument, based on *Sabbatino* and *French,* is unsound and unsupportable.

 In the first place, the interventors' premise that the importers' claims to recover the monies paid by mistake are claims for breach of contract is incorrect. While claims of this nature are often referred to as arising out of a contract implied in law or in quasi contract, they are not contract claims in the true sense at all. They are not based on any agreement or assent of the party charged or any contract relationship between the payor and the recipient of the payment. Such claims are obligations arising out of unjust enrichment and are imposed by law in the interests of reason and justice. 17 C.J.S. Contracts § 6 (1963) and cases there cited. Thus, the importers' claims for relief are not, as the interventors' contend, claims for breach of contract situated in Cuba and therefore subject to a Cuban act of state repudiating them even assuming an act of state to that effect had taken place.

That these obligations arose out of the mistaken payment of debts due and owing in the United States by importers located here has already been made clear. All payments by the importers were made by check drawn against their accounts in banks in the United States. Most of the payments were made to collecting banks in the United States acting on behalf of the interventors. The funds from such checks as were sent directly to Cuba, could only be realized upon when collected from the drawee banks in the United States. I see no reason why these obligations should be affected by any acts of the Cuban Government.

Finally, it may be noted that there was no formal repudiation of these obligations by Cuban Government decree of general application or otherwise. This is in contrast to *French* where the repudiation of the tax exemption certificates was based on official decision of the Cuban Currency Stabilization Fund applying generally to all such certificates. Here, all that occurred was a statement by counsel for the interventors, during trial, that the Cuban Government and the interventors denied liability and had refused to make repayment. This statement was made after the interventors had invoked the jurisdiction of this Court in order to pursue their claims against the importers for post-intervention shipments. It is hard to conceive how, if such a statement can be elevated to the status of an act of state, *any* refusal by *any* state to honor *any* obligation at *any* time could be considered anything else.

To say that the refusal of the interventors to honor their obligations to repay the amounts by which they were unjustly enriched under the circumstances of these cases constituted a foreign act of state which must be given effect in our courts, would extend the act of state doctrine to unprecedented and unconscionable lengths. It would render nugatory the sound principle that our courts will not give extra-territorial effect to a confiscatory decree of a foreign state and thereby emasculate the public policy of the forum against confiscation. See Palicio v. Brush & Bloch, 256 F.Supp. at 487–488, and cases there cited.

---

the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party . . . based upon (or

traced through) a confiscation or other taking after January 1, 1959, by an act of that state in violation of the principles of international law. . . .
22 U.S.C. § 2370(e) (2)

Accordingly, I hold that the importers may recover from the interventors by way of set-off the monies paid the interventors on account of pre-intervention shipments and that such recovery is not barred by the act of state doctrine.

## Interest

There remain the questions of what, if any, interest should be awarded (a) to the interventors, on the amounts recovered from the importers for post-intervention shipments; (b) to the owners, on the amounts recovered from the importers for pre-intervention shipments; and (c) to the importers, on the amounts recovered from the interventors for monies paid by mistake.

### A.

A party suing in contract for a readily ascertainable sum generally is entitled to interest on his recovery of the amount due as a matter of right from the date the claim accrued to the date of verdict or judgment. *E. g.*, United States v. Eastern Air Lines, Inc., 366 F.2d 316 (2d Cir. 1966); Bank of China v. Wells Fargo Bank & Union Trust Company, 209 F.2d 467 (9th Cir. 1953); Restatement, Contracts § 337.

In New York, the rule is stated in CPLR § 5001, which provides that "[i]nterest shall be recovered upon a sum awarded because of a breach of performance of contract . . ." and " . . . shall be computed from the earliest ascertainable date the cause of action existed . . . ."

The rule is based upon the premise that the party to whom the money is owed has been deprived of the use of the funds and can be made whole only by the award of interest. Conversely, the party owing the money has had the use of the funds he was obligated to pay, and should be required to pay compensation by way of interest therefor. De Long Corp. v. Morrison-Knudsen Co., 14 N.Y.2d 346, 251 N.Y.S.2d 657, 200 N.E.

2d 557 (1964); Kavares v. Motor Vehicle Accident Indemnification Corp., 29 A.D.2d 68, 285 N.Y.S.2d 983 (1967); Lesjac Realty Corp. v. Mulhauser, 43 Misc.2d 439, 251 N.Y.S.2d 62 (1964).

In the case at bar there was a readily ascertainable sum due to the interventors from the importers for the cigars sold and delivered post-intervention, payable according to the terms of the sales. These sums were not paid when due and the interventors have been deprived of the use of the money due them since that time while the importers have had the use of such money.

The importers, however, resist the application of the rule on the ground that unusual circumstances here have relieved them from the obligation to pay interest. They contend that, as parties faced with conflicting claims, they had no means of stopping interest, by disposing of the amounts due for post-intervention shipments through process in the courts without exposing themselves to the risk of double liability; that this was because of the course adopted by the interventors which, it is claimed, amounted to acquiescence in the retention of the amount due and that therefore interest did not accrue.

There are circumstances in which the danger of exposure to double liability if the amount due is disposed of through court process, and acquiescence in the retention of the amount due may stop the running of interest. See Bank of China v. Wells Fargo Bank & Union Trust Company, *supra*; United States v. McDonald Grain & Seed Co., 135 F. Supp. 854 (D.N.D.1955); Fleschner Bros. v. Consolidated Edison Co. of New York, 279 App.Div. 69, 107 N.Y.S.2d 598 (1st Dep't 1951), aff'd, 304 N.Y. 815, 109 N.E.2d 471 (1952); N. Y. Life Ins. Co. v. Cooper, 76 F.Supp. 976, 979 (S.D.N.Y.1944); Equitable Life Assurance Soc. of United States v. Miller, 229 F. Supp. 1018 (D.Minn.1964).[13]

---

13. When the allowance of interest turns on complicated and uncommon circumstances the Court, consistent with the applicable law, should exercise a measure of discretion to reach the most equitable result on the facts before it. *Cf.* Riley v. General

The importers urge that the interventors, under the circumstances here, should be held to have waived or lost the right to interest given them by CPLR § 5001, even though this would yield a windfall to the importers. I do not agree.

It will be recalled that subsequent to September 15, 1960, the date of intervention, the importers made regular payments to the interventors for the amounts due for shipments of cigars, both pre-intervention [14] and post-intervention. In early 1961, however, the nine actions at bar were commenced against the importers by the owners, in the names of the expropriated Cuban entities seeking to recover the purchase price of all shipments of cigars which had been manufactured in the Cuban factories, both before and after intervention, as well as injunctive and other relief. The interventors were not made parties to these actions.

Shortly thereafter, however, the interventors commenced the Palicio v. Brush & Bloch action. That action was brought on behalf of the interventors in the names of the expropriated entities against the attorneys who had instituted the nine actions at bar against the importers. The interventors sought an injunction against the owners' attorneys, restraining them from prosecuting the actions at bar in the names of the plaintiffs and a direction that the interventors' attorneys be substituted as attorneys for the plaintiffs in these actions. The only issue presented there was whether the interventors or the owners were entitled to pursue the claims asserted against the importers in the nine actions at bar now for the purchase price of cigar shipments and the other claims asserted in these actions.

With respect to the post-intervention shipments, *Palicio* held that the interventors, and not the owners, were en-

titled to pursue the claims against the importers for post-intervention shipments in the actions at bar. 256 F.Supp. 494.

While *Palicio* was being litigated, these nine actions remained in abeyance and no steps were taken in them. The interventors did not seek to intervene in these actions nor was any effort made by the importers to bring them in. But it was obvious that if the interventors succeeded in establishing their right to pursue claims against the importers in *Palicio*, they would intervene in the nine actions at bar and proceed to judgment.

This, of course, is what happened subsequent to final judgment in *Palicio*, when the posture of the cases at bar was adjusted in accordance with that judgment. The interventors then became parties plaintiff to these actions and now have been held entitled to recover the amounts due for post-intervention shipments from the importers.

I do not see how, in these circumstances, the interventors can be said to have waived or lost their rights to interest. As I said in *Palicio*, the procedure followed there furnished

. . . an expeditious and convenient means of securing the determination of the ultimate questions necessarily involved in this case. The interests of orderly judicial administration would not be served by requiring the interventors to move to intervene in each of the . . . actions now pending or to institute separate suits against the importers. In short, the present action is a sound vehicle for expeditiously determining basic issues of great importance to the parties involved with a minimum of inconvenience to those parties and to the court. 256 F.Supp. 485–486.

These issues went to the heart of the basic question on this aspect of the cases at bar, which was whether the owners

Mills, Inc., 346 F.2d 68, 72 (3d Cir. 1965); Okeechobee County, Fla. v. Nuveen, 145 F.2d 684, 687–688 (5th Cir. 1944), cert. denied 324 U.S. 881, 65 S.Ct. 1028, 89 L.Ed. 1432 (1945).

14. As I have held, the payments to the interventors for pre-intervention shipments were made by mistake since the owners were entitled to be paid therefor. Sections A–D, *supra*.

or the interventors could recover the price of the post-intervention shipments, the amount of which was not seriously disputed by the importers. It can scarcely be imagined that the importers were not fully aware of this and its implications.

The interventors were representatives of a foreign government and not citizens or residents of or present in the United States for purposes of service, and thus could not be brought into these actions unless they voluntarily submitted to jurisdiction. The importers complain that they were unable to obtain jurisdiction over the interventors until they became parties to these cases after *Palicio* and that therefore none of the usual remedies by which they could have disposed of the amount due without exposure to double liability were available to them. This may well have been true, absent the interventors' consent to jurisdiction, in the case of such remedies as federal statutory impleader under 28 U.S.C. § 1335; interpleader under Rule 22, Fed.R.Civ. P.; and, perhaps, interpleader under N. Y.C.P.L.R. §§ 314 and 1006. *See* Cordner v. Metropolitan Life Ins. Co., 234 F. Supp. 765 (S.D.N.Y.1964). *But cf.* N.Y. C.P.L.R. § 216; Solicitor for Affairs of His Majesty's Treasury v. Bankers Trust Co., 304 N.Y. 296, 107 N.E.2d 455 (1952). Likewise, deposit in Court in the cases at bar under Rule 67, Fed.R. Civ.P. might not have been an effective remedy during the period before the interventors became parties to these actions unless the interventors had consented to appear.

But the importers made no effort to employ any of such remedies or to determine whether the interventors, represented by responsible counsel in *Palicio* were willing to appear. Moreover, even when the interventors became parties to these actions after *Palicio,* the importers made no effort to deposit the amount due in Court when it was clearly safe for them to do so. They were content to sit on their rights and let matters take their course. This is scarcely consistent with

their position that they had no choice but to retain the funds.

Even more significantly, the importers, with full knowledge that the interventors were parties plaintiff in *Palicio* and that issues vital to the post-intervention claims in the cases at bar were being litigated in that case in this very Court, made no attempt to intervene there pursuant to Rule 24, Fed.R.Civ.P. Had the importers done so and intervention been allowed, deposit of the amount due in Court in that action pursuant to Rule 67, Fed.R.Civ.P. would have adequately protected them. Moreover, there is nothing to show that the interventors would have opposed such an application had it been made. If the interventors had done so and been successful in their opposition and thus prevented the importers from disposing of the funds in *Palicio,* this would have lent substantial support to the importers' claim that they were unable to protect themselves against exposure to double liability. Any such support is now quite lacking in the record.

I hold that under the *circumstances* here the interventors did not lose or waive their rights to interest on their recovery for post-intervention shipments and are entitled to such interest from the date of commencement of Palicio v. Brush & Bloch.

### B.

The claims of the owners for interest on their recoveries against the importers and of the importers for interest on their recoveries against the interventors do not require extended discussion.

 The owners' recoveries against the importers are in contract for the agreed price of pre-intervention shipments. Thus, under the New York Statute, CPLR § 5001(a), the owners have the right to interest on such recoveries. There is nothing in the facts and circumstances here which would justify holding that the owners waived or lost that right, a holding which would be highly inequitable.

The importers take the position that "[T]he owners' claim for interest assumes significance only if the Court should find that the importers still owe the owners for pre-intervention shipments but that the importers may not recover those monies from the interventors." and that, "[O]f course, if the Court should find that the importers have a valid claim over against the interventors, then it is the interventors, the receipients of those payments, not the importers, who must bear the ultimate burden to pay interest on those funds."

The position taken by the importers is essentially correct and the interventors do not seriously question this. Plainly, the owners are in no way responsible for the mistake of the importers in making payments to the wrong parties for the pre-intervention shipments. As I have held, such payments did not discharge the importers' contract obligations to the owners for such shipments. Nor did they deprive the owners of the right to interest on their recoveries given them by law.

On the other hand, the importers, having paid out to the interventors an amount equivalent to the sums due to the owners because of mistake made in good faith, in practical effect were deprived of the use of that amount of money. It is the interventors who have had the use of such money ever since the payments to them were made.

That interest may be allowed on a recovery of this nature is quite clear. N. Y. CPLR § 5001(a), 5 Weinstein, Korn & Miller, New York Civil Practice, ¶¶ 5001.04, 5001.06. Whether in these cases such interest may be awarded as a matter of law or in the exercise of the Court's discretion may not be entirely clear but makes little, if any, difference here. For it is quite plain in the facts and circumstances of these cases that the equities require the Court, in the exercise of its discretion, to award interest to the importers on their recoveries against the interventors.

■ I hold that the owners are entitled to interest on their recoveries against the importers and that the importers are entitled to interest on their recoveries against the interventors. In each such instance, interest will run from the date of the commencement of the actions at bar.

### Additional Findings

A few disputes of fact left undetermined by stipulation of the parties relating to items listed in the schedules contained in Exhibit A remain to be resolved. As to these disputes, I find as follows:

1. Cifuentes has not established that the shipments listed on schedule B–1, amounting to $7,340.65, were shipped to Dunhill on or before September 15, 1960, the date of intervention, and is not entitled to recover from Dunhill therefor.

2. Palicio has established that the shipment represented by item #1 of schedule C–1, amounting to $984.50, was made to Dunhill prior to September 15, 1960 and is entitled to recover from Dunhill therefor.

3. Menendez has established that the shipment represented by item #12 of schedule E–1, amounting to $9,573.50, was made to Faber prior to September 15, 1960 and is entitled to recover from Faber therefor.

4. Palicio has established that the shipment represented by item #8 of schedule G–1, amounting to $6,945.33, was made to Faber prior to September 15, 1960 and is entitled to recover from Faber therefor.

5. Larranga has established that the shipment represented by item #6 of schedule H–1, amounting to $10,180.05, was made to Faber prior to September 15, 1960 and is entitled to recover from Faber therefor.

6. Menendez has established that it sent and Faber received the shipments represented by items #1 and #12 of schedule E–1, amounting to $20,315.50, and is entitled to recover from Faber therefor.

7. Faber has established that it paid the interventors for shipments represented by item #9 of schedule E–1 ($24.25); items #3, #6 and #7 of schedule F–1,

totaling $25,455.80; items #1 and #2 of schedule G–1, totaling $8,866.75; and item #3 of schedule H–1 ($12,584.31), and is entitled to set off these amounts from the interventors' recovery.

The recoveries of the various parties will be adjusted to reflect these findings.

### III. Trademark Infringement and Unfair Competition.

When intervention took place, the owners had held trademarks for many years on each of the major brands of cigars they produced and sold, which were registered in the United States Patent Office, in Cuba and in a number of other countries.[15] In their original complaints in the nine actions now before me, the owners asserted claims against the importers for infringement of these trademarks and unfair competition based on the continuing sale by the importers of cigars bearing these marks which the importers purchased from the interventors, subsequent to intervention.

In Palicio v. Brush & Bloch, *supra,* the interventors contended that the owners were not entitled to pursue these trademark claims against the importers, primarily on the ground that the trademarks were an integral part of the owners' businesses in Cuba which had been taken over by the Cuban decrees of intervention and that this Court was therefore proscribed by the act of state doctrine from questioning such takings. That contention was rejected. I held that the owners were entitled to pursue the claims for trademark infringement and unfair competition against the importers which they had asserted in the present nine actions.

However, since the importers were not parties to the *Palicio* case, that decision was confined to rights as between the owners and the interventors. The is-

sues as to whether the owners were in fact entitled to any rights under the trademarks as against the importers and whether there had been any infringement remained to be litigated and determined in the actions now before me.

When the posture of the present actions was adjusted to conform to the *Palicio* decision, the owners, in addition to their claims against the importers for infringement and unfair competition, which had been initially asserted, also asserted separate claims for trademark infringement and unfair competition against the interventors. I now turn to these claims of the owners against the importers and the interventors.

### A.

For many years prior to intervention, the owners sold cigars under their trademarks throughout the United States and other parts of the world. These cigars were recognized in the tobacco trade and in the cigar-smoking world as the finest and most expensive made. They were manufactured from tobacco grown on premier plantations in the Vuelta Abajo region of Cuba, generally considered to be the best area in the world for producing highest grade cigar tobacco. This region is peculiarly and uniquely endowed for producing fine tobacco, due to a combination of the quality of its soil, climatic conditions, rainfall and distance from the sea insulating it from the adverse effects of salt air on the tobacco. Efforts to produce tobacco of comparable quality in Vuelta Abajo soil transplanted to other parts of Cuba have been unsuccessful and Cuban seed planted in other parts of the world has failed to produce tobacco of comparable quality.

The cigars sold under these trademarks were known in the trade as "clear Havana", *i.e.,* the entire cigar, including the wrapper, was made from Cuban

15. The trademarks claimed to have been infringed are the following: "H. Upmann" and "Monte Cristo", owned by Menendez, Garcia y Compania, Limitada (Menendez, Garcia); "Partagas" and "Ramon Allones", owned by Cifuentes y Compania (Cifuentes); "Por Larranaga", owned by Por Larranaga, Fabrica de Tabacos, S.A. (Por Larranaga) and "Hoyo De Monterey", "Belinda", and "Punch", owned by F. Palicio y Compania, S.A. (Palicio).

tobacco. Thus, a prime factor in the outstanding quality of these cigars was the tobacco used in their manufacture.

In addition, the Cuban entities were family businesses with a long tradition of producing great cigars. Those who owned and directed the operations of the entities were highly skilled and experienced in the techniques of cigar manufacture and this was reflected in the high quality of the product.

The owners and the importers spent large sums each year to advertise and promote these cigars in this country. These efforts were successful. The reputations of the cigars bearing these trademarks were firmly established and generally recognized. Sales steadily increased and in the years immediately prior to intervention millions of these cigars were being sold annually in the United States.

Following intervention, the tobacco factories, now under the sole direction and control of the interventors, continued the manufacture of cigars. Those who had previously owned and operated the factories left them for the last time on September 15 when intervention occurred or, in some cases, the next day. They no longer had any connection with the factories or businesses in Cuba. There is little, if anything, in the record concerning the manner in which the interventors carried on operations, though the interventors claim that the manufacturing process continued in the same way as before and that they continued to turn out cigars of the same quality. There is no evidence that the quality of the product deteriorated during the period involved here.

Most of the cigars shipped by the interventors to the importers between September 15, 1960 and February, 1961, had been made up prior to September 15 and were on hand as inventory when the takeover occurred. However, a number of critical steps, such as, selection, pressing, packing, fumigating, cellophaning and boxing, still had to be taken by the interventors before the cigars were ready for shipment. Only a small portion of the cigars in the inventory had been through these critical steps and were ready for shipment at the time of intervention.

The transfer of control to the interventors does not seem to have seriously interrupted the flow of cigars to the importers or their distribution in this country. The cigars were shipped by the interventors in the same packaging and under the same registered trademarks as the owners had used. Nothing was done to indicate to the purchaser that the cigars had come from factories which had been taken over by the Cuban Government or that they were being made or processed by anyone other than the owners.

Relations between the importers and the interventors appear to have been harmonious during this period. The business patterns which had been established by the owners and the importers were continued after takeover. Orders were taken and filled, credit was extended and payment was made in the manner theretofore customary. All shipments were made f. o. b. Havana. Until March, 1961, shortly after shipments to the importers ceased, the interventors continued to employ as their United States sales representatives the same people who had previously represented the owners. These representatives actively solicited the sale of cigars exported by the interventors.

For reasons not entirely clear, relations between the importers and interventors eventually cooled. The last shipment to the importers was made in February, 1961. After that date, all shipments of Cuban cigars were channeled through one R. C. Wood and RCW Supervisor, an entity specifically set up in the United States by the Cuban Government for that purpose. There is nothing in the record as to the nature and extent of the operations of Wood and RCW Supervisor.

On February 7, 1962, the United States declared an embargo against further trade with Cuba. Proc. 3447; 27 Fed.Reg. 1085, note following 22 U.S.C.

A. § 2370. The importation of cigars from Cuba then ceased.

It is plain that after intervention occurred, the owners no longer had any means of obtaining tobacco grown in the Vuelta Abajo region or, indeed, any Cuban tobacco. Thus, they could not have manufactured or sold cigars made of such tobacco under their registered trademarks or otherwise, even if the manufacturing facilities had been available to them. The owners' registered trademarks have not been assigned or used to any significant extent by the owners since intervention, with the exception of those formerly owned by Palicio.

Palicio assigned the trademarks "Belinda" in 1963 and "Hoyo de Monterey" and "Punch" in 1966. The assignments reserve any rights Palicio may have to recover for prior infringements. The assignees have manufactured, in Florida, and sold cigars, mainly of Honduran tobacco, under these trademarks since the assignments. Several hundred thousand of these cigars are currently sold annually. Palicio's financial interest is limited to small royalties.

The trademarks "Ramon Allones" and "Partagas" were used on 250 cigars shipped to this country in July, 1967 by Temple Hall, Ltd. of Kingston, Jamaica, a firm employing Ramon Cifuentes as technical adviser. These cigars were a blend of Jamaican, Mexican and Connecticut tobaccos, the same blend used in other Temple Hall cigars sold under different brand names. It appears that the small shipments under these two trademarks were merely samples and no further shipments have occurred, apparently for the reasons that the owner was awaiting the determination of its trademark rights in this litigation.

Similarly, in 1966 Menendez shipped some 250 cigars to the United States, manufactured in the Canary Islands and containing no Cuban Tobacco but bearing the "Upmann" and "Monte Cristo" trademarks. Jose M. Garcia, one of the Menendez partners, conducts this Canary Islands operation which produces cigars from a blend of the best non-Cuban tobaccos from several countries of the world. These cigars, comparable in price to those formerly manufactured by his firm in Cuba, are sold in this country under trademarks other than those involved in this case, with the exception of the small sample shipment just mentioned.

Jorge Palicio and Ramon Cifuentes have acted as consultants for tobacco firms. With the exception of those already mentioned, none of the trademarks involved here have been used by an owner since intervention.

B.

The owners contend that the facts establish a clear case of trademark infringement under Sections 32(1) (a) [16] and 43(a) [17] of the Lanham Act (15 U.

16. § 1114. *Remedies; infringement; innocent infringement by printers and publishers*

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; . . . shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.

17. § 1125. *False designations of origin and false descriptions forbidden*

(a) Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending falsely to describe or represent the same, and shall cause such goods or services to enter into commerce, and any person who shall with knowledge of the falsity of such designation of origin or description or representation cause or

S.C. §§ 1114(1) (a) and 1125(a)) and of unfair competition under New York State law.[18]

The following facts have been firmly established:

1. At the time of commencement of these actions, the owners owned and for many years had owned the United States registered trademarks in suit.

2. For many years these trademarks had represented to the cigar trade and the cigar-smoking public in the United States cigars made of Cuban tobacco from the Vuelta Abajo region, manufactured by the respective owners in their Cuban factories with the skill and care which the owners had acquired through long experience in these businesses.

3. After the Cuban businesses and factories were expropriated by the Cuban Government, the interventors continued to ship cigars from the factories in Cuba to the United States, in the same packaging and bearing the identical trademarks which had previously been used by the owners.

4. The cigars so imported were sold by the importers to customers in the United States under such trademarks.

### C.

The importers urge that, taking into account all the facts and circumstances in these cases, there was no infringement by them and also assert that, even if infringement occurred, they cannot be held liable to the owners therefor. They say, further, that, even assuming liability for infringement, the owners have suffered no damage by reason thereof and are not entitled to any recovery or relief.

The interventors take essentially the same position and, in addition, urge that there are special considerations applicable to them which bar recovery.

### (1)

The importers and the interventors contend that the owners have lost any rights which they possessed in the trademarks involved here and thus have no standing to enforce claims for infringement. They rely on the general proposition that trademark rights can exist only appurtenant to a going business and cannot exist "in gross" or in abstract, citing such cases as Hanover Star Milling Co. v. Metcalf, 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713; United Drug Co. v. Theodore Rectanus Co., 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141; Rogers v. Ercona Co., 107 U.S.App.D.C. 295, 277 F.2d 94 (1960); Family Circle, Inc. v. Family Circle Associates, Inc., 332 F.2d 534, 549 (3rd Cir. 1964); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619, 625 (5th Cir. 1964).

This contention rests on two prongs. The first is that after the seizures occurred and the owners fled to the United States, they never again engaged in the business of manufacturing cigars to which the trademarks could be appurtenant. The second is that, in any event, the trademarks were identified exclusively with cigars made of the finest grade of Vuelta Abajo Cuban tobacco and that since the owners were no longer able to obtain such tobacco they could not have engaged in a business to which these trademarks were appurtenant, even had they wanted to. The argument is not well taken.

It must be remembered that we are dealing here with claims for infringement of trademark during a very limited four and one-half month period, from

procure the same to be transported or used in commerce or deliver the same to any carrier to be transported or used, shall be liable to a civil action by any person doing business in the locality falsely indicated as that of origin or in the region in which said locality is situated, or by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

18. Jurisdiction over these claims for relief is based on 28 U.S.C. §§ 1331 and 1338.

September 15, 1960 to early February, 1961, when the post-intervention shipments on which the infringement claims are based occurred. The rights of the owners must be viewed in the light of the situation at that time and not as of the time of trial, many years later. Viewed in that light, the argument that the owners had lost any rights to enforce these claims has little substance.

In February, 1961, the owners had been ousted for less than 5 months from the businesses which they had successfully carried on for many years. They had fled to this country and were uncertain of what they would be able to do and were groping for solutions. The interventions were plainly a major disaster with highly traumatic overtones. There is nothing in this record to indicate that the owners had any intention of abandoning the manufacture of cigars which had been the livelihood of their families for generations.

As I pointed out in Palicio v. Brush and Bloch, 256 F.Supp. at 492, the owners had the right to continue business here in the names of the confiscated entities and such rights were not extinguished by the confiscation of their Cuban properties. They were certainly entitled to a reasonable period to determine whether they could do so.

Moreover, it could scarcely be said during that period that it would be impossible for them to obtain Cuban tobacco, on which there was then no embargo, in the future, or even to resume association with their businesses in Cuba. Among the many possibilities were a change in the policy or in the composition of the government of Cuba, the failure of the interventors to operate the factories effectively thus necessitating recall of the owners to Cuba in a managerial capacity, or the finding of an independent source of supply of Cuban tobacco. It will serve no useful purpose to explore these possibilities further or to discount them in terms of hindsight. It is quite plain that in this short period the conclusion that the businesses of the owners to which the trademarks were appurtenant, were abandoned or no longer existed or existed only in gross, is unwarranted.

■ The proof in the cases at bar only serves to confirm the conclusion reached in Palicio v. Brush & Bloch that the owners neither had the intent to abandon nor did they abandon their trademarks at the time the rights asserted in these cases accrued, 256 F. Supp. 492, and cases there cited. Trademark rights are not destroyed by temporary suspension of the business to which they are appurtenant due to causes beyond the control of their owner as the cases dealing with liquor during the Prohibition era clearly illustrate. *See* Kelly Liquor Co. v. National Brokerage Co., 102 F.2d 857 (C.C.P.A.1939), Hannis Distilling Co. v. George W. Torrey Co., 32 App.D.C. 530 (1909); G. F. Heublein & Bros. v. Bushmill Wine & Products Co., 55 F.Supp. 964 (M.D.Pa. 1944); Bisceglia Bros. Corp. v. Fruit Industries, Ltd., 20 F.Supp. 564 (E.D. Pa.), aff'd, 101 F.2d 752 (3 Cir., 1937); Mack & Milans, Legal Status of Liquor Trade-marks and Trade Names Since Repeal, 2 Geo.Wash.L.Rev. 415 (1934). *See also* Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena, 293 F.Supp. 892 (S.D. N.Y.1968), modified, 433 F.2d 686 (2d Cir. 1970), cert. denied, 403 U.S. 905, 91 S.Ct. 2205, 29 L.Ed.2d 680 (1971).

Cases relied on by the interventors (cited at p. 553, *supra*) are in no way to the contrary. In these cases the parties asserting trademark rights never had businesses to which the marks could become appurtenant. They merely reflect the general rule that trademark rights do not come into being until there is a business established which uses them.

To hold that the trademark rights which the owners assert, were extinguished under the facts and circumstances here would run directly counter to the dual goals of the Lanham Act of providing protection both to the rights

of trademark owners and to consumers against confusion and deception.[19]

■ The owners did not lose their rights to these trademarks by reason of the suspension of their businesses, nor have they thereby lost their standing to enforce their claims for infringement.

### (2)

It is argued that there is no liability to the owners for infringement or, in the alternative, that nothing may be recovered if infringement occurred because the owners were guilty of laches in asserting their rights and acquiesced in the use of their marks by the interventors and the importers.

■ These arguments are largely based on the facts which have just been discussed concerning the owners' conduct during the brief period from their arrival in this country in late September or early October, 1960, and the cease and desists demands sent by their attorneys some four months later, in early February, 1961. Considering the parlous circumstances in which the owners found themselves and their conduct during the period, I can see no basis on which they can be said to be guilty of laches or acquiescence.

The importers were made fully aware of all the facts by the owners during October, 1960. It is apparent that the factual picture and the legal picture were highly confusing. The owners had had no adequate opportunity to evaluate the situation nor to consult adequately with their lawyers. It would be wholly unreasonable to require them to make specific cease and desist demands during that period. They acted with reasonable celerity under the circumstances.

There is no indication that had they made such specific demands either the interventors or the importers would have ceased using the trademarks. The indications are quite to the contrary. It can scarcely be imagined that the interventors, who had just arbitrarily seized the owners' businesses, would heed any protests from the owners. It is highly unlikely that the importers, who had established relations with the interventors and with the Christmas market approaching, would have done so either. In fact, one of the importers received and accepted a shipment from the interventors after receiving the cease and desist demand. Neither the interventors nor the importers have shown any prejudice as a result of the owners' understandable short delay in taking affirmative steps to assert their rights.

I hold that the owners acted with reasonable promptness in asserting their rights and are not chargeable with laches or acquiescence.

### (3)

The contention is made that there was no infringement here because the post-intervention cigars sold under these trade names were manufactured by the owners and were merely part of the inventory seized from the owners by the interventors. It is urged from this that the cigars actually reflect the source of origin and that since the likelihood of confusion as to source of origin, which is the foundation of a trademark infringement action under the Lanham Act, 15 U.S.C. § 1114(1), did not exist, no infringement took place. The case is ingeniously likened to that of one who steals a Ford car and sells it, who may be liable for conversion but not infringement of the Ford trademark.[20]

The attempted analogy is not consonant with the facts here. It ignores the

---

19. In fact, the contention made here is not unlike a claim of loss of trademark rights because of temporary suspension of business due to major natural catastrophe. Such a proposition is patently unsound.

20. *See generally* 3 Callman, Unfair Competition, Trademarks, and Monopolies, § 84.1(b) & (c). *Compare* Prestonettes v. Coty, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924) *and* Champion Spark Plug Co. v. Sanders, 331 U.S. 125, 67 S.Ct. 1136, 91 L.Ed. 1386 (1947) *with* Bourjois & Co. v. Katzel, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923).

fact that while most of the cigars shipped after intervention had been made up while the owners were operating the factories, a number of critical steps in their processing still had to be taken by the interventors before they were ready for sale or shipment. There were steps in which the owners' peculiar skill, experience and techniques were of great importance. Thus, these cigars were not salable, finished products, seized from the owners. A substantial and critical part of the manufacturing process remained to be accomplished and this portion of the manufacture was done under direction and control of the interventors and not the owners.

The trademarks indicated to the consuming public both that the cigars were made from the highest grade Vuelta Abajo Cuban tobacco and that the owners were the source of origin. The marks also indicated that the cigars had been made by the owners with the same skill, care and expert techniques which had been employed during many years and which were part of the reputation for excellence which the cigars enjoyed. The owners' trademarks affixed to the cigars shipped by the interventors misrepresented both that the owners were the source of origin and that the cigars had been produced by the owners with the same skills and expert techniques which had always been employed and on which the reputation for excellence of cigars bearing such trademarks had been based in substantial part. The owners and all that they represented no longer stood behind these cigars as the consumer was led to believe.

■ While there was no significant evidence that the quality of the cigars shipped by the interventors had deteriorated to any substantial degree, the potential for such deterioration was there. Infringement does not depend on whether the product sold was actually inferior in quality to the product represented by the trademark. The potential difference in quality arising from misdesignation of source of origin is quite enough.

*E.g.*, 3 Callman, Unfair Competition, Trademarks and Monopolies § 82.2(a), at 774.

■ The use of the owners' trademarks on the post-intervention shipments was likely to cause confusion and mistake and to deceive the consuming public and thus constituted infringement.

### (4)

The interventors' contention that the owners should be barred from relief by the unclean hands doctrine is not well taken.

Two sample shipments of 125 cigars each, containing no Cuban tobacco, respectively bearing the Menendez, Garcia trademarks "Ramon Allones" and "Partagas", apparently were made to the importers in 1966.

Two similar sample shipments of 125 cigars each, bearing respectively the Cifuentes "Upmann" and "Monte Cristo" trademarks, were made to the importers in 1967. These were the only shipments of cigars bearing these trademarks. Apparently, no more were shipped because Menendez, Garcia and Cifuentes were awaiting the outcome of this litigation.

The contention that Menendez, Garcia and Cifuentes are barred from relief by unclean hands is based solely on these shipments.

■ There is no doubt that a trademark owner who deceives the public by debasing the quality of the product for which his trademark stands may be barred by unclean hands from maintaining an action for infringement. *See* Worden v. California Fig Syrup Co., 187 U.S. 516, 23 S.Ct. 161, 47 L.Ed. 282 (1903); Mulhens & Kropff, Inc. v. Ferd. Muelhens, Inc., 43 F.2d 937 (2d Cir.), cert. denied, 282 U.S. 881, 51 S.Ct. 84, 75 L. Ed. 777 (1930); 4 Callman, Unfair Competition, Trademarks and Monopolies § 87.1(b) et seq. Note, The Besmirched Plaintiff and the Confused Public: Unclean Hands in Trademark Infringement, 65 Colum.L.Rev. 109 (1965).

But there is not the slightest evidence that by making these very small sample shipments to the importers a number of years after these actions had been commenced, Menendez, Garcia and Cifuentes deceived or intended to deceive anyone. There is nothing to show that these cigars were sold even to the importers, much less to the public. In fact, all the evidence points to the contrary. There is no support in this record for the contention that Menendez, Garcia and Cifuentes were guilty of unclean hands.

Palicio assigned its trademarks "Belinda" and "Hoyo de Monterey" in 1963, and "Punch" in 1966. Cigars bearing these trademarks and containing only Honduran tobacco were thereafter manufactured by the various assignees in Tampa, Florida and have since been sold in not insubstantial quantities. The boxes in which these cigars were sold did not indicate that they were made of Cuban tobacco but merely that the tobacco was imported and plainly stated that the cigars were manufactured in Florida.

On the basis of these facts, it is asserted that Palicio should be denied recovery because of unclean hands.

The infringements complained of here occurred in late 1960 and early 1961, more than two years before Palicio made the first assignments of its trademarks. Palicio expressly reserved its rights to pursue these claims. There is no evidence of any substance that Palicio had any control over the assignees or can be held responsible for their conduct.

The burden of establishing the defense of unclean hands is on the party asserting it. 4 Callman, Unfair Competition, Trademarks and Monopolies § 87.1(b) (4) and cases there cited. I hold that the defense of unclean hands as against Palicio has not been sustained.[21]

### (5)

The interventors contend that since the cigars to which the trademarks were affixed were manufactured, boxed and labelled in Cuba and were shipped f. o.b. Havana, the Lanham Act has no application to the infringement claims against them. There is no merit to this contention.

The facts are that the cigars were shipped by the interventors to the United States with the full knowledge and intention that they would be sold to consumers in this country. Indeed, the interventors employed three sales representatives to promote such sales. Any confusion or deception arising from the interventors' use of the owners' United States marks, was upon persons purchasing the cigars in this country. The infringement and the resulting harm complained of by the owners occurred not in Cuba but here.

> [I]n cases of trade-mark infringement and unfair competition, the wrong takes place not where the deceptive labels are affixed to the goods or where the goods are wrapped in the misleading packages, but where the passing off occurs, i. e., where the deceived customer buys the defendant's product in the belief that he is buying the plaintiff's.

Vanity Fair Mills v. T. Eaton Co., 234 F.2d 633, 639 (2d Cir.), cert. denied, 352 U.S. 871, 77 S.Ct. 96, 1 L.Ed.2d 76, rehearing denied, 352 U.S. 913, 77 S.Ct. 144, 1 L.Ed.2d 120 (1956). *See also* 4 Callman, Unfair Competition, Trademarks and Monopolies, § 100.2(a) (2) at

---

21. Moreover, it may be noted that by the time the assignees began the distribution of cigars bearing the trademarks formerly owned by Palicio, the embargo against importations from Cuba had been in effect for some time and had been widely publicized. The importation of Cuban cigars and tobacco ceased when the embargo went into effect. It is at least doubtful whether the discriminating smokers who bought cigars bearing these trademarks, were not fully aware that Cuban cigars and Cuban tobacco were no longer obtainable in this country and that the cigars they bought from the assignees were not made of Cuban tobacco.

No attempt was made to show that deception had occurred and there is no proof that anyone was, in fact, deceived.

2235; Rappaport, Trade-mark and Unfair Competition in International Conflict of Laws: An Analysis of the Choice of Law Problem, 20 U.Pitt.L.Rev. 1, 29 (1958).

The Lanham Act provides that any person who shall "use in commerce" a registered mark belonging to another "shall be liable in a civil action by the registrant for the remedies" provided in the statute, 15 U.S.C. § 1114(1). "Commerce" is defined as "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Here, the interventors used the registered marks of the owners in commerce in the United States lawfully subject to regulation by Congress. There is no question of giving extraterritorial effect to the Lanham Act as the interventors contend.[22]

Steele v. Bulova Watch Co., Inc., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952), relied on by both parties, appears to expand somewhat the territorial scope of the Lanham Act and supports rather than casts doubt on the conclusion reached here. In applying the Lanham Act where the effects of the acts complained of were felt in this country, the Court said:

> Viewed in its context, the holding in [American Banana Co. v. United Fruit Co., 213 U.S. 347 [29 S.Ct. 511, 53 L.Ed. 826] (1909)] was not meant to confer blanket immunity on trade practices which radiate unlawful consequences here, merely because they were initiated or consummated outside the territorial limits of the United States. . . . [T]he crux of the complaint . . . is . . . [that] petitioner by his "own deliberate acts, here and elsewhere, . . . brought about forbidden results within the United States."

*Id.* at 288, 73 S.Ct. at 256–257.

Moreover, it is abundantly clear that the application of the Lanham Act to the facts here is entirely consistent with international law. *See* Restatement, American Foreign Relations Law, § 38; *cf.* Steele v. Bulova Watch Co., Inc., 344 U.S. 280, 73 S.Ct. 252, 97 L.Ed. 252 (1952); United States v. Holophone Co., 119 F. Supp. 114 (S.D.Ohio 1954), aff'd per curiam, 352 U.S. 903, 77 S.Ct. 144, 1 L.Ed.2d 114 (1956).

It is quite plain that the Lanham Act governs the infringement claims at bar, and I so hold.

### (6).

The other contentions advanced by the interventors are patently without merit and need little, if any, discussion.

### (a)

The International Convention for the Protection of Industrial Property (Paris Union), 53 Stat. 1748 (1883, as revised June 2, 1934), T.S. No. 941, to which both the United States and Cuba are parties, does not affect these cases in any way. The Convention does not insulate foreign citizens from liability for trademark infringement and unfair competition committed in this country, as the interventors appear to claim.

### (b)

The remedies provided by Section 526 of the Tariff Act of 1930, 19 U.S.C. § 1526, Section 42 of the Lanham Act, 15 U.S.C. § 1124, are not, as the interventors urge, the exclusive remedies available against a foreign manufacturer or importer who infringes United States registered trademarks in this country. There is nothing in either statute which remotely indicates that the remedies they provide are or were intended to be the only remedies available. It is clear that the general provisions of the Lanham Act may be invoked against foreign citizens who in-

---

22. *Cf.* Vanity Fair v. T. Eaton Co., *supra*, and George W. Luft Co. v. Zande Cosmetic Co., 142 F.2d 536 (2d Cir.), cert. denied, 323 U.S. 756, 65 S.Ct. 90, 89 L.Ed. 606 (1944), where, conversely, the courts refused to give trademark infringement relief where the acts complained of initiated in the United States but took effect or were consummated in other countries.

fringe United States trademarks in this country, whether or not resort has been had to the remedies provided in 19 U.S.C. § 1526 and Section 42 of the Lanham Act.

### (c)

The interventors' act of state argument, as applied to the claims for trademark infringement and unfair competition, was fully disposed of in Palicio v. Brush & Bloch, 256 F.Supp. 490–493. Nothing more on that subject is required here. American Banana Co. v. United Fruit Company, 213 U.S. 347, 29 S.Ct. 511, 53 L.Ed. 826 (1909), relied on by the interventors, is not to the contrary and is not in point.

### (7)

■■■ Dunhill argues that, as the exclusive dealer for Menendez, Garcia "Monte Cristo" cigars, it had the right to use that trademark while the exclusive dealership contract remained in effect and therefore cannot be held to have been an infringer. This argument and Dunhill's attempt to draw support for it from Zwack v. Kraus Bros. & Co., 133 F.Supp. 929 (S.D.N.Y.1955), aff'd in part and remanded, 237 F.2d 255 (2d Cir. 1956), is more ingenious than meritorious. Neither of the opinions in Zwack lend the slightest support to Dunhill's position. An exclusive dealer for a trademarked product has no right to use the trademark on products manufactured by others. See, e. g., Flexitized, Inc. v. National Flexitized Corporation, 335 F.2d 744 (2d Cir. 1964), cert. denied, 380 U.S. 913, 85 S.Ct. 899, 13 L.Ed.2d 799; cf. Monsanto Chemical Co. v. Perfect Fit Products Co., 349 F.2d 389 (2d Cir. 1965), cert. denied, 383 U.S. 942, 86 S.Ct. 1195, 16 L.Ed.2d 206.

### (8)

■■■ I find that each of the owners has established that both the importers and the interventors violated the Lanham Act by infringing the owners' reg-istered United States trademarks for their respective brands of cigars.

### D.

■■■ It necessarily follows from this finding that it has also been established that the importers were guilty of unfair competition under New York law. This is so whether the New York law of unfair competition "is governed by essentially the same principles" which govern trademark infringement under the Lanham Act, Avon Shoe Co. v. David Crystal, Inc., 279 F.2d 607, 614 (2d Cir.), cert. denied, 364 U.S. 909, 81 S.Ct. 271, 5 L.Ed.2d 224 (1960); Chester Barrie, Ltd. v. Chester Laurie, Ltd., 189 F.Supp. 98, 103 (S.D.N.Y.1960), or is considerably broader and covers "a wide variety of situations to insure that 'one may not misappropriate the results of the skill, expenditures and labors of a competitor'." Flexitized, Inc. v. National Flexitized Corporation, supra, 335 F.2d at 781 citing, Electrolux Corp. v. Val-Worth, Inc., 6 N.Y.2d 556, 567, 190 N.Y.S.2d 977, 986, 161 N.E.2d 197, 203 (1959).

### E.

The owners seek injunctive and monetary relief. The question of what relief they are entitled to must next be determined.

### (1)

The owners seek an injunction against future violations of their trademark rights under Section 34 of the Lanham Act, 15 U.S.C. § 1116. It is plain that they are not entitled to such relief at this time.

The last shipment of cigars bearing these trademarks to any of the importers was made in February, 1961. All shipments by the interventors to the United States ceased when the embargo against Cuban goods went into effect in February, 1962. As far as the record here shows, there have been no sales of cigars bearing these trademarks in the United States by the importers or the interventors for many years.

■ Plainly, there is no likelihood of any violations of the owners' United States rights by the importers or the interventors in the foreseeable future. Under these circumstances, the issuance of an injunction would be an empty gesture. No ground for injunctive relief has been shown and such relief must be denied.

(2)

Under Section 35 of the Lanham Act 15 U.S.C. § 1117, the owners "subject to the principles of equity" are entitled to recover "any damages sustained" because of the infringements.

The owners have been unable to show that they sustained any damage by reason of the infringements here. During the relatively brief period after intervention with which we are concerned, the owners were not engaged in the cigar business. They were not selling Cuban cigars or any others. Thus, they did not suffer any diversion of business which might have come to them but for the use of their marks by the importers and interventors.

Moreover, there is no evidence that the owners' reputations or those of their trademarks were tarnished or impaired in any way by the post-intervention sales of cigars bearing their marks. There is no evidence of any substance that the cigars shipped and sold after intervention were inferior in any respect to those on which the owners had built their reputations and goodwill. Phoenix Manufacturing Co. v. Plymouth Mfg. Co., 286 F.Supp. 324, 331 (D.Mass. 1968). Indeed, it is probable that the continued use of the marks in the post-intervention period was beneficial rather than otherwise. The marks were kept before the consuming public and the diminution in goodwill which might have resulted had they disappeared from the market did not occur.

There is no evidence to support the owners' claim that the continuing sales of the cigars shipped by the interventors made it difficult for them to obtain the financial support necessary to re-establish their businesses here and thus deprived them of sales which they otherwise would have been able to make. Moreover, after intervention the owners were unable to obtain the Cuban tobacco required to manufacture cigars which could properly bear their marks. This made it impossible for them to continue making sales to their former customers, whether they obtained financial backing or not.

(3)

Section 35 provides for recovery "subject to the principles of equity" of "defendant's profits". It further provides that

[i]f the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum . . . shall constitute compensation and not a penalty.

■ It is well established that, despite what appears to be the mandatory language of the statute, the granting or denial of an accounting of profits depends on the circumstances of the particular case. The most recent and definitive pronouncement in this Circuit on when an accounting may be granted is in Monsanto Chemical Co. v. Perfect Fit Products Mfg. Co., *supra*. There defendant was found to have deliberately infringed plaintiff's trademark "Acrilan". However, the trial court declined to award an accounting on the grounds that the parties were not competitors. On appeal the critical issue was whether the facts justified an accounting.

The Court of Appeals considered the two views on the propriety of an accounting in trademark infringement suits then generally prevailing. The narrower and more conventional view, expressed in Durable Toy & Novelty Corp. v. J. Chein & Co., 133 F.2d 853 (2d Cir.), cert. denied, 320 U.S. 211, 63 S.Ct. 1447, 87 L.Ed. 1849 (1943), was that an ac-

counting "is justified only to the extent that injury is shown already to have been suffered." 349 F.2d at 392.

"An accounting has been thought proper only as an indirect measure of the plaintiff's injury, that is, only if some relationship between the infringer's profits and the plaintiff's injury can be inferred. As a result accountings have been limited to cases in which the parties are competing for trade and the defendant's trade may thus be presumed to have been diverted from the plaintiff."

Id. at 392.[23] Since the owners were not selling cigars during the period in which the infringements occurred and were in no sense damaged by the infringements, an accounting would plainly be denied under this view.

The second view awarded an accounting on "the principles of unjust enrichment" on the theory that the trademark right is an intangible property right. Id. at 392. See Baker v. Simmons Co., 325 F.2d 580, 582 (1st Cir. 1963); Blue Bell Co. v. Frontier Refining Co., 213 F.2d 354, 362–363 (10th Cir. 1954); Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 36 S.Ct. 269, 60 L. Ed. 629 (1916).

Prior decisions of this Circuit had squarely rejected the view that the trademark right was an intangible property right, see Durable Toy & Novelty Corp. v. J. Chein & Co., supra, and had apparently adopted the view that an accounting was proper only where damages could be presumed and thus only where the parties were competitors. See Admiral Corp. v. Penco, Inc., 203 F.2d 517 (2d Cir. 1953); Triangle Publications, Inc. v. Rohrlich, 167 F.2d 969 (2d Cir. 1948). But cf. Maternally Yours, Inc. v. Your Maternity Shop, Inc., 234 F.2d 538, 545 (2d Cir. 1956), Dad's Root Beer v. Doc's Beverages, 193 F.2d 77, 82–83

(2d Cir. 1951) allowing an accounting where the parties marketed similar products but in different geographical markets.[24]

The Court in Monsanto, viewing the purposes of the Lanham Act as protection of the public from deception and of the trademark owner from piracy, overruled Durable Toy, Admiral, and Triangle Publications insofar as they were contrary and adopted the more flexible approach of Dad's Root Beer and Maternally Yours, "which refer to the traditional discretion of a court of equity in adapting its relief to the case before it." 349 F.2d at 395.

Relying on factors peculiar to the case, the Court granted an accounting for the following reasons: First, despite the difficulties of proof "it seems obvious that there must have been some economic injury to Monsanto, such as loss of sales to legitimate producers and the loss of the good will of some of the retail purchasers of Perfect Fit's inferior 'Acrilan' mattress pads." Id. at 396.

Moreover, the public interest required an accounting under the circumstances present there. Only by granting an accounting would the infringement be made sufficiently unprofitable as to deter future infringements. The need for deterrence was found to be particularly acute as to defendant Perfect Fit, which had "taken up trademark infringement as its principal line of business." Id. at 396.[25]

The Court concluded:

"We do not hold that it is irrelevant whether the parties are in direct competition; compensation for diverted trade is one important purpose which an accounting may serve. To restrict accountings to this single purpose, however, fails to take account of the other purposes served by the trademark law. Under the circumstances of this case, a judgment limited to an

---

23. See Restatement, Torts, § 747; Note, 1963 Wash.U.L.Q. 243.

24. The Monsanto opinion cast doubt on the soundness of the distinction in terms of policy or precedent. Id. at 395.

25. Perfect Fit had egregiously misused the Acrilan trademark on numerous occasions.

injunction is clearly inadequate to deter those who deliberately engage in commercial piracy which defrauds thousands of consumers and injures a trade name built up at considerable cost by legitimate means."

*Id.* at 397.

 *Monsanto* makes it plain that an accounting of profits is not required merely because infringement has been proven and that whether or not an accounting should be granted is dependent upon a variety of factors. Viewing the facts and circumstances in the cases at bar in the light of the facts referred to in *Monsanto,* it is clear to me that accounting not only is not required here but would not be appropriate.

If an accounting were granted in these cases, it is difficult to conjure up a case where it should not be granted. The trademarks were used by both the importers and the interventors in good faith and in the honest and reasonable belief they were entitled to use them. As has been pointed out, there was confusion as to the legal rights of the various parties. There is no evidence that either importers or interventors wilfully and intentionally set about to use marks which they knew belonged to others or to deceive the public in any way.

Though there was plainly at least technical infringement, there is no significant evidence that the cigars sold after intervention under the marks were inferior to those previously sold by the owners or that the consumers purchasing them received anything less than what they expected or bargained for. *Cf.* Phoenix Manufacturing Co. v. Plymouth Mfg. Co., 286 F.Supp. 324, 331 (D. Mass.1968).

Moreover, as has been pointed out, the owners were not damaged by the infringement. No sales which they otherwise would have made were diverted from them. Neither their reputations nor their marks were stained or damaged in any way. Viewed realistically, whatever damage was sustained by the owners came about because of the expropriations of their businesses in Cuba, which this Court is proscribed from questioning, and not because of the trademark infringements.

Thus, in these cases, there is no evidence of wrongful intent, harm to the public or damage to the owners arising from the infringements.

In contrast, *Monsanto* involved a deliberate and successful design to trade on the good will of the plaintiff's marks and to deceive the consuming public by one whose principal line of business was trademark infringement. As a result, the public was defrauded and economic loss was inflicted on the plaintiff. There an accounting was fully justified, if not essential, as a deterrent to further such conduct and to effectuate the purposes of the statute.

In the cases at bar an accounting would serve little purpose other than to provide the owners with a windfall and to punish the importers and interventors for acts done without wrongful intent.

 What has already been said as to denial to the owners of relief under the Lanham Act makes it plain that they are not entitled to damages or an accounting on their claims of unfair competition under New York law. *See* Electrolux Corp. v. Val-Worth, *supra*; Flexitized Inc. v. National Flexitized Corp., *supra*.

### F.

Saks contends that the interventor of Menendez, Garcia is obligated by contract to indemnify it for the costs, including counsel fees, of defending the trademark infringement claims.[26]

The post-intervention shipment made to Saks and the prior shipments made by the owner were made pursuant to purchase orders which had printed on the back, among other terms the following:

(14)—You agree to protect, indemnify and hold us harmless from any

---

26. It has been stipulated that the counsel fees incurred by Saks in defending the trademark claims up to January 14, 1969 amount to $3,000.

claim, loss, damage, charge, cost and expense, including attorneys' fees, which may result to us from any claim of infringement of patents, copyrights or trademarks or claim of unfair competition, in connection with the merchandise covered by this order . ."

At the top of the back of the order is the heading, in large boldface capital letters, "ADDITIONAL TERMS, CONDITIONS AND INSTRUCTIONS—PLEASE READ." The front of the order states:

We hereby order the merchandise, supplies or services described above, subject to the terms, conditions and instructions printed and written on the face and reverse sides hereof.

■ It is well-settled that a purchase order is an offer to enter into a contract which is accepted by the seller when the goods ordered are shipped. *E.g.*, Williston, Sales (Rev. ed.) § 56, at 13; Restatement, Contracts § 52.

The Menendez, Garcia intervenor contends that he could not reasonably have been expected to have been aware of the quoted terms on the back of the order because they were in small print, difficult to read and in English rather than Spanish. He urges, therefore, that he is not bound thereby.

None of this is persuasive. The expropriated factory was carrying on extensive business with American importers. The order forms used in that business, including the Saks form, were all in English and were the same as had been used previously. There is not a scintilla of evidence that the intervenor, to say nothing of his employees who were dealing with the details of the transactions, had any difficulty in understanding English.

All the terms on the reverse side of the purchase order are in the same type under a heading which could not have been missed, warning that they should be read. The terms are printed and not at all illegible.

■ No good reason has been shown why the terms and conditions of the order should not have been fully understood by the shippers. By shipment of the goods, the Menendez, Garcia intervenor became contractually bound by the terms of the order. He is obligated under such terms to indemnify Saks for its reasonable counsel fees and Saks is entitled to recover the amount of such fees from him.

■ The contention of Dunhill and Faber that they are also entitled to recover counsel fees for defending the infringement claim from the intervenors is in a different posture. In contrast to the Saks purchase order, the Dunhill and Faber orders made no reference whatsoever to such indemnification and there is no contract obligation to that effect.

Dunhill and Faber were fully aware of the facts as they continued to purchase cigars from the intervenors and should have been as aware as the intervenors of any possible legal consequences of so doing. Their claims for indemnification of counsel fees are wholly without substance or merit and are in all respects denied.

\* \* \*

In conclusion, it may be noted that the other points raised by the parties, including statute of limitation questions, have been considered and have been deemed so lacking in merit as to require no discussion. It should also be noted that dollar amounts referred to in this opinion are approximate only and are subject to correction in the final judgment.

This opinion constitutes my findings of fact and conclusions of law in these cases.

Settle judgment on thirty days' notice.

## SUPPLEMENTAL MEMORANDUM

BRYAN, District Judge:

In my opinion of March 17, 1972 in these cases, I held that the defendant importers are entitled to set off the amounts paid by them to the intervenors on account of pre-intervention shipments for which the importers were held liable to

the owners against the amounts owed by them to the interventors for post-intervention shipments.

Apparently, the amounts paid by defendant Dunhill to the interventors on account of pre-intervention shipments are greater than the amounts which Dunhill owed the interventors for post-intervention shipments. Dunhill paid out a total of approximately $148,600 to the interventors on account of pre-intervention shipments for which Dunhill is liable to the owners. Yet, the amounts owed the interventors by Dunhill for post-intervention shipments total only some $93,000. The other defendant-importers are not in this position since the amounts that these importers paid out to the interventors for pre-intervention shipments are less than the amounts these importers owe the interventors for post-intervention shipments. Consequently, Dunhill has moved for a finding that it is entitled to affirmative judgment on its counterclaims against the respective interventors for the differences between the amounts paid out on account of pre-intervention shipments and the amounts owed the interventors for post-intervention shipments, instead of being limited to offsetting the amounts previously paid against the amounts owed.

The interventors have submitted no papers in opposition and do not appear to oppose this application. The owners take the position that my original opinion should not be disturbed, but apparently do not oppose Dunhill's application, either, and indeed could not well do so.

■ No reason has been advanced why Dunhill's application for such affirmative judgments against the interventors should not be granted, nor do I see any. The same considerations which led me to hold Dunhill entitled to offset the amounts in question against the amounts due to the interventors now impels the conclusion that Dunhill is entitled to affirmative relief for the differences between the amounts it owed to the respective interventors and the amounts previously paid to the interventors on account of pre-intervention shipments which the owners are entitled to recover from Dunhill.[1] I so find.

The judgments in these cases will reflect this finding and will be settled on 20 days' notice. Proposed judgments will be submitted within 15 days from the date of filing of this supplemental memorandum. Separate judgments will be entered for each of the three groups of cases which have been consolidated for all purposes. Thus, separate proposed judgments will be submitted for settlement for each of the following consolidated actions:

(1) 61 Civil 472, 582, 583, 584

(2) 61 Civil 848, 849, 850, 869

(3) 61 Civil 3336

IT IS SO ORDERED.

---

1. *No questions with respect to execution of such judgments are before me and I express no view on that subject.*